WALLACE A. LOWELL

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed October 23, 1907.*

1. CRIMINAL LAW—*proof must establish the guilt of particular charge set forth.* In criminal cases it is not sufficient, to sustain a conviction on a particular charge, to prove that the defendant was guilty of some other charge or of general bad and criminal conduct.

2. CONSPIRACY—*an indictment for conspiracy to defraud public need not name the persons defrauded.* It is not necessary to the validity of an indictment for a conspiracy to cheat and defraud the public generally, that it should set out the names of the persons intended to be cheated and defrauded.

3. SAME—*effect where indictment for conspiracy to cheat and defraud names intended victim.* If an indictment for conspiracy to cheat and defraud names the person intended to be cheated and defrauded the proof must correspond with the allegation, and it is not sufficient to prove a conspiracy to defraud the public generally, or any person whom the defendants might meet.

4. SAME—*what does not sustain a conviction for conspiracy to defraud.* A conviction, under an indictment for conspiracy to defraud a named person of his money by writing worthless insurance policies, is not sustained by proof that the defendants conspired to defraud the public, generally, by such means; that they never knew the person named in the indictment until he took out his policy, and that such person had sustained no loss, although some other persons who had taken out policies with the defendants had sustained losses which were not paid.

WRIT OF ERROR to the Branch Appellate Court for the First District;—heard in that court on writ of error to the Criminal Court of Cook county; the Hon. W. M. McEwen, Judge, presiding.

M. L. THACKABERRY, for plaintiff in error:

The conspiracy to do an unlawful act is a separate and distinct offense from that of the act itself, and is to be governed in this prosecution by the provisions relating to conspiracies and not those relating to the specific offense. *Commonwealth* v. *McHale,* 97 Pa. St. 397.

There must be a criminal intent in conspiracy, which involves knowledge. *People* v. *Powell,* 63 N. Y. 88; *People* v. *Flack,* 125 id. 324.

An averment in an indictment for a conspiracy that the defendants conspired to defraud Jackson is not supported by proof that they conspired to defraud the public generally, or any individual whom they might meet or be able to defraud. 2 Wharton on Crim. Law, (7th ed.) sec. 2357.

If the conspiracy is executed and a felony has been committed the offense merges in the felony, and the effect is to render the indictment incapable of supporting a conviction of conspiracy, which is everywhere rated as a misdemeanor. *People* v. *Mather,* 4 Wend. 265; *Commonwealth* v. *Kingsbury,* 5 Mass. 106; *Commonwealth* v. *Parr,* 5 W. & S. 345; Wright on Crim. Law, 223, 224.

JOHN J. HEALY, State's Attorney, and F. L. BARNETT, (FRANK M. FAIRFIELD, of counsel,) for the People:

If persons combine to do an unlawful thing they are presumed to understand the consequences of their acts. *Spies* v. *People,* 122 Ill. 1.

The Statute of Limitations in conspiracy cases does not begin to run from the date of the forming of the conspiracy, but from the date of the last overt act in furtherance of the object of the conspiracy. *Ochs* v. *People,* 124 Ill. 429; *State* v. *McKey,* 111 Ind. 380.

The court will not reverse a judgment clearly sustained by the proof, because of improper remarks by counsel. *Wilson* v. *People,* 94 Ill. 299; *Duffin* v. *People,* 107 id. 115; *Garrity* v. *People,* id. 162; *Kirby* v. *People,* 123 id. 436.

Mr. JUSTICE FARMER delivered the opinion of the court:

Plaintiff in error and one Walter M. Cowell were at the November term, 1904, of the criminal court of Cook county indicted for conspiracy. The indictment contained two counts, each charging that the defendants conspired together to cheat and defraud, by false pretenses, one Nelson R. Jackson out of twelve dollars, the property and money of the said Jackson. The case was tried in February, 1905. After the jury were empaneled defendant Cowell withdrew his plea of not guilty, entered a plea of guilty and became the principal witness for the prosecution in the trial of the plaintiff in error.

The means used by plaintiff in error and Cowell in the alleged conspiracy to cheat and defraud Jackson out of his money were, as appears from the proof, by writing worthless fire insurance policies, collecting premiums thereon from the property owner without any ability, and, it is claimed by the prosecution, without any intention, to pay losses if any occurred. The method of conducting their business appears to have been as follows: They organized a corporation under the laws of Wisconsin, which they called "The Wisconsin Insurance Agency Company." This corporation was not an insurance organization, but merely acted as agent in soliciting and writing insurance for such Lloyd companies as plaintiff in error and Cowell organized or represented. A Lloyd company is explained in the proof to mean an association of men who agree to conduct an insurance business, and give to some person or corporation, as their agent, authority to represent them and write insurance policies of a limited liability. The names of a number of men would be used as one association and styled "The United Lloyds;" another, "The United Fire Underwriters;" another, "Equitable Fire Insurance Company;" another, "Fire Underwriters' Alliance," and so on. Eight of such associations or companies appear to have been organized, or pretended to have been organized, by the plain-

tiff in error and Cowell. With possibly one exception it appears that the men whose names were used as the underwriters by the plaintiff in error and Cowell were financially worthless, and neither the plaintiff in error nor Cowell was worth anything. Cowell had some stocks, securities and alleged title papers to lands aggregating a considerable sum of money, but he testified they were all worthless, and that this was known to the plaintiff in error as well as to himself. These stocks, securities and title papers were the only assets, as far as the evidence shows, that were behind the policies written by the Wisconsin Insurance Agency Company. They were made to answer for each one of the associations purporting to write insurance, by Cowell turning them over to one of the parties in such association and then procuring the affidavit of the person to whom the conveyance or transfer was made, stating that for the purpose of procuring a financial standing and for the benefit of policy holders and others interested, the affiant was the owner of the property described in the affidavit, worth a certain value. This part of the business appears to have been done by Cowell, and when for any reason it was inconvenient to get the affidavit of the party, Cowell testifies he wrote the signature to the affidavit and attached his jurat to it as notary public. One illustration is what purports to be the affidavit of Thomas M. Bell. In said affidavit said affiant is represented as swearing that he is the owner of real estate in the city of New Orleans, La., Omaha, Neb., Pierre, S. D., Long Island, N. Y., farm lands in Michigan and Missouri, and that said property is free from liens and encumbrances and is reasonably worth $470,500, and that affiant places his financial worth at more than $1,000,000 above all exemptions and offsets. Bell's name is one of those represented by plaintiff in error and Cowell as being one of the underwriters of the United Fire Underwriters. He is described in their literature giving what is purported to be a statement of the assets and liabilities and a list of

the underwriters, as a "capitalist, Chicago, Ill." In the same statement the assets of the United Fire Underwriters are represented to be $332,979.64 and liabilities "none." Cowell testified that Bell did not sign the affidavit and was not sworn to it, but that he (Cowell) wrote Bell's name to the purported affidavit and signed his own name to the jurat as notary public, certifying that it had been sworn to by Bell. Cowell further testified that the assets thus passed from one person to another from whom affidavits were secured or pretended to be secured for use by him and plaintiff in error in securing business, were "hot air and blue sky." Plaintiff in error was not sworn on the trial, but a large amount of correspondence between him and Cowell and others associated with them in the business was introduced in evidence, and it is claimed this correspondence shows plaintiff in error thought the "assets" held by Cowell were good and that Cowell so represented them to him.

It is not shown by the abstract of the testimony how much business the parties did during the period of something like two years they were operating. The proof tends to show they did considerable business, but it is not shown how many losses occurred. One witness who was employed by the plaintiff in error and Cowell testified that during the first four months of 1903 he heard people talking to plaintiff in error every day about losses because they were not paid. The witness testified he did not know how many losses occurred while he was employed, but gave it as his opinion that thirty-five or forty occurred. Cowell testified there were from twenty to twenty-five losses during the time they were conducting the business. The proof shows that two small losses were paid. The testimony does not show whether any other losses were paid or not.

Differences and ill-feeling arose between plaintiff in error and Cowell and they separated, plaintiff in error retiring from the business. Whether this occurred in April or October, 1903, is a disputed question. At a meeting of the

Wisconsin Insurance Agency Company held in its office in Kenosha on April 18, 1903, the following resolution was adopted:

"*Resolved,* That whereas the insurance business of this company has proved to be unsatisfactory, that we, from and after this date, discontinue this branch of the business, and furthermore resolve that we hereby sell and deliver all the property, of every kind and nature, belonging to the Wisconsin Insurance Agency Company, connected with their insurance department, together with all that belonging to the Union Lloyds and the United Fire Underwriters of Chicago, Ill., to E. M. Green & Co., and do hereby appoint the said E. M. Green & Co. attorneys for the said Union Lloyds and the United Fire Underwriters, with full power of substitution and revocation."

This is signed by plaintiff in error, the owner of 124 shares of the stock of the corporation, Cowell, the owner of 124 shares, and John F. Pershing, the owner of one share. The total capital stock of the corporation appears to have been 250 shares. Numerous letters from Lowell, running all through the years 1902 and 1903, were offered in evidence, which tended to show that he did not retire from the business, as the resolution would indicate. The date of the retirement of plaintiff in error from all connection with the business is urged as being very important, for the reason, it is contended, that if he did retire in April, 1902, then the offense was barred by the Statute of Limitations before the indictment was returned. The policy to Jackson was issued September 9, 1902, and the indictment returned November 23, 1904. There is a large mass of testimony in the record, consisting of over 1600 pages,—a great deal of which is of a documentary character, including a large number of letters written by plaintiff in error down to as late as January, 1904,—which is inconsistent with his claim that he severed his connection with the business and retired from it in 1902. There is also the oral testimony of witnesses to the same effect.

The testimony abundantly shows that the assets, which were practically the sole reliance of persons taking policies

in any of the associations represented by plaintiff in error and Cowell for the payment of losses, if any were sustained by the insured, were entirely worthless, and the persons whose names were used as underwriters of the various insurance organizations were tools of the plaintiff in error and Cowell and owned no property or means that could be reached for the payment of losses. Practically the only capital or property of plaintiff in error and Cowell, or the insurance organizations they represented, was the premiums collected from persons who took policies with them. It is insisted by plaintiff in error that he did not know Cowell possessed no means or that the assets before referred to were worthless, but this contention we think is not sustained by the evidence. Cowell testified that he told him they were valueless, but it is argued that Cowell should not be believed, because after the jury were empaneled he withdrew his plea of not guilty, entered a plea of guilty and then became the chief witness for the State under an arrangement with the prosecutor that for so doing he would be allowed to go without punishment. In his testimony he admitted his unfriendliness to plaintiff in error and that he had said he would like to get him in the penitentiary. Plaintiff in error's knowledge of the worthlessness of the assets and securities of Cowell does not depend alone upon Cowell's testimony. From the manner in which this alleged property was used to secure business, and from other testimony in the record, including letters written by plaintiff in error, the conclusion is irresistible that he knew they were of no value, and if this were the only question to be determined in this case we could not say that this fact was not sufficiently proven by the evidence.

The proof on the part of the State as to losses sustained by policy holders, and the practice of plaintiff in error and Cowell as to paying or refusing to pay them, is not of a very definite character. Frank Wetterhahn, who worked from July or August, 1902, until January, 1904, in the office of

plaintiff in error and Cowell as superintendent of agents, a part of the time under the direction of plaintiff in error, testified that during this period he thought there were thirty-five or forty losses; that he knew of two losses, one of $4.50 and one of $62, being paid; that people were talking to Lowell the first four months of 1903 about losses not being paid, and that Lowell would tell them he would pay every honest loss. This is substantially the testimony relating to the failure or refusal of the insurance organizations operated by plaintiff in error and Cowell to pay losses.

The most serious question raised in this record is whether the proof sustains the allegations of the indictment. The indictment does not charge plaintiff in error with obtaining money by false pretenses, but with entering into a conspiracy with Cowell to obtain money and property, to-wit, twelve dollars, from one Nelson R. Jackson. It is contended by plaintiff in error that as the indictment charges a conspiracy to defraud a particular individual it must be proven as alleged, and that it is not sufficient to prove a conspiracy to defraud the public generally, or all persons whom they could procure to deal with them. The proof shows that Jackson took a policy in the Union Lloyds through plaintiff in error and Cowell, and paid premiums amounting in all to $11.50. He did not, however, sustain any loss. Whether he would have been paid if he had sustained a loss can only be conjectured from the proof relating to the methods and practices of the parties toward others who did sustain losses. Cowell testified that he never knew Jackson, and that when he and plaintiff in error associated themselves together he had no intention of cheating or defrauding him out of any money or property, and that he never had any such intention at any time afterwards. It is clear from the proof that plaintiff in error and Cowell never conspired together to procure money from any particular person or persons, and that Jackson, a colored man running a barber-shop, was to them unknown. The object and pur-

pose of the parties in associating themselves together in the insurance business was to procure money from any and all persons whom they could induce to take policies in the organizations they represented.

In *Commonwealth* v. *Harley*, 7 Metc. 506, the indictment charged defendants, Robert Harley and Philenia Harley, with conspiring, combining and agreeing together to cheat and defraud one Stephen W. Marsh out of a piano forte. The trial court instructed the jury that it was not necessary for the prosecution to prove an agreement or conspiracy to cheat and defraud Marsh in particular, but if the proof showed, beyond a reasonable doubt, that the defendants united and agreed together to cheat the public generally, or any individual whom they might meet, and be able to defraud, and in pursuance of that agreement one of the defendants made and delivered to the other defendant promissory notes to enable him to carry into effect the unlawful agreement, that the notes were received by said defendant with intent to use them for the purpose of cheating said Marsh, and that he did use them for that purpose and thereby cheat and defraud Marsh of a piano forte, the offense against the defendants was proven, although it did not appear that Philenia Harley (the one who gave the notes) knew Marsh was the individual to be defrauded or that the defendants had agreed together to perpetrate this particular fraud on him. The court held it was competent, in an indictment, to charge a conspiracy to defraud the public generally, but said: "The government having elected to set forth in the indictment a special intent to defraud Stephen W. Marsh as the object of the conspiracy on the part of both conspirators, Philenia Harley and Robert Harley, that allegation was a material one, and the government was bound to establish it by proof. But that allegation could not be established by proof that the defendants conspired and agreed together to cheat the public generally, or any individual whom they might be able to defraud. Such fact of a

conspiracy to cheat Stephen W. Marsh cannot be said necessarily to result, nor can it be legally inferred, from the fact of a conspiracy to cheat the public generally, or any person whom they might meet." This rule was followed and the above case cited with approval in *Commonwealth* v. *Kellogg,* 7 Cush. 473.

In Wharton on Criminal Law, (vol. 2, sec. 1396,) after quoting from Tindal, C. J., it is said: "Where, therefore, the persons injured were defined at the time of the conspiracy and ascertainable by the pleader, their names should be specified in the indictment. Where, however, the conspiracy was to defraud a class not capable of being at the time resolved into individuals, or to defraud the public generally, then the specification of names is impracticable and hence unnecessary. An intent to cheat A as an individual is not sustained by evidence of an intent to cheat the public generally."

In McClain on Criminal Law (vol. 2, sec. 982,) it is said: "Where the charge is of a conspiracy to defraud in general, it is not necessary to specifically allege the name of the person or persons intended to be defrauded. It is enough to charge the intent to defraud persons of a particular class or description. But if the conspiracy charged is to defraud a particular person he should be named, and the proof must correspond to the allegation in this respect. If the charge is of a conspiracy to defraud the public generally, proof of an intent to defraud a particular person will constitute a variance. But it is not necessary to allege the name of all persons intended to be injured. It is sufficient to state the names of some and that the names of others are to the grand jurors unknown."

It is not necessary to the validity of an indictment for a conspiracy to cheat and defraud that it should set out the names of the persons intended to be cheated and defrauded if the conspiracy was not aimed at a particular or definite individual but was aimed to cheat and defraud the public

generally. In such case an indictment containing appropriate averments that a conspiracy was entered into by the defendants for the purpose of defrauding the public generally, or the State, or the United States, as the case may be, would be a good indictment. (2 Bishop on Crim. Proc. sec. 210.) The rule has been long established that under an indictment for larceny a variance between the proof and the allegations of the indictment as to the ownership of the property is fatal. The rule appears to be the same in prosecutions for conspiracy to cheat and defraud. This indictment charges the defendants with conspiring to cheat and defraud Jackson, who was unknown to the defendants, or either of them, so far as the proof shows, before he took a policy in one of their companies. Jackson never sustained any loss, and no liability accrued to him on account of the insurance policy written for him in one of the organizations represented by plaintiff in error and Cowell. It cannot be said that the allegations of a conspiracy with the intent to cheat and defraud Jackson are sustained by proof of an intent to cheat and defraud the public generally. Neither can it be inferred from proof that some persons who insured with plaintiff in error and Cowell and paid their premiums sustained losses that were not paid, that therefore Jackson, who sustained no loss, would have been refused payment if the insured property had been destroyed. In criminal cases it is not sufficient, to sustain a conviction on a particular charge, to prove that the defendant was guilty of some other charge or of general bad and criminal conduct, but the proof must establish his guilt of the particular charge set forth in the indictment. This rule was not complied with in this case, and we are of opinion, therefore, the court erred in overruling the motion for a new trial.

The judgment is therefore reversed and the cause remanded.

*Reversed and remanded.*