(No. 15749.—Reversed and remanded.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. FRED MADER, Plaintiff in Error.

*Opinion filed October 28, 1924.*

1. CRIMINAL LAW—*what does not prove charge of conspiracy.* A charge that the defendant, an agent of a labor union, conspired "with other persons" to obtain money by means of the confidence game, false pretenses or boycott, is not proved by evidence that the defendant dealt directly with the prosecuting witness and obtained the money from her under an agreement that he would call off a strike and clear certain work from union labor prohibition.

2. SAME—*what is necessary to prove conspiracy.* To prove a person guilty of the crime of conspiracy it is not sufficient to show a passive acquiescence on his part with the illegal act, but it is necessary to show a bad design or criminal intent between two or more persons to accomplish an unlawful result.

3. SAME—*conspiracy cannot be committed by one person, alone.* To constitute the crime of conspiracy there must be more than one person guilty thereof, and before a defendant can be convicted the evidence must show that there are two or more persons guilty of the conspiracy.

4. SAME—*defendant must be found guilty of the crime charged.* It is not sufficient to sustain a conviction on a particular charge to prove that the defendant is guilty of some other charge or of generally bad and criminal conduct but the proof must establish his guilt of the particular charge in the indictment.

WRIT OF ERROR to the Second Division of the Appellate Court for the First District;—heard in that court on writ of error to the Criminal Court of Cook county; the Hon. WILLIAM E. DEVER, Judge, presiding.

JAMES J. BARBOUR, and OTIS F. GLENN, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, and EDWARD C. FITCH, (HENRY T. CHACE, JR., EDWARD E. WILSON, and CLYDE C. FISHER, of counsel,) for the People.

Mr. CHIEF JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error, Fred Mader, (herein called defendant,) and Orrington C. Foster, were, "with other persons to the grand jury unknown," indicted by the grand jury of Cook county for conspiracy. The indictment contained six counts charging various conspiracies, as follows: First count, to defraud the Woman's Exchange of Chicago of $1400 by means of a confidence game; second count, to defraud the Woman's Exchange of Chicago of $1400 by false pretenses; third count, to cause certain laborers to boycott the Whitestone Company unless the Woman's Exchange of Chicago paid them $1400; fourth count, to deprive the Whitestone Company of the lawful use of its building by means of boycott; fifth count, to injure and destroy the business of the Whitestone Company by means of boycott. The defendant alone was tried, there being a severance for the purpose of trial, and was found guilty as charged before the court and a jury and was sentenced to pay a fine of $1000 and to serve a term of one year in the penitentiary. The judgment of the criminal court was affirmed by the Appellate Court for the First District, and this writ of error has been sued out to review the judgment.

In the fall of 1920 Marshall & Fox, architects and engineers, were building the Drake Hotel, in Chicago, for the Whitestone Company. Foster was superintendent of construction in the employ of Marshall & Fox. Mader was at that time the business agent of the Fixture Hangers' Union. The contract under which the building was being constructed provided for the employment of union labor. The Woman's Exchange of Chicago is a charitable organization, of which Mrs. Narcissa Thorne was vice-president, and was given the contract to furnish about 2000 lamps, with shades, for the hotel. Of those lamps about 609 were bedside lamps. The Woman's Exchange had the lamps manufactured by a company which employed non-union labor, and the shades

were made for all the lamps by the Woman's Exchange by the employment of women, who made the shades at their homes. Complaint was made on behalf of the union that the lamps were "unfair,"—that is, were manufactured by non-union labor,—and on November 2, 1920, a strike of the Fixture Hangers' Union was called by Mader on account of these lamps. The work of the installation of the lamps was suspended until November 22, 1920, on which date that work was resumed and completed after the adjustment of all disputed matters, as hereinafter related.

In view of our conclusion in this case it will only be necessary to determine two questions on this record: (1) How and by what means and for what purpose the defendant obtained the money that was paid him by the Woman's Exchange of Chicago; and (2) does the proof show that he obtained the money by a conspiracy with Foster or with any other person or persons unknown to the grand jury, as charged in any count of the indictment,—that is, is he guilty of the crime of conspiracy as charged?

The evidence in the record is in substance the following: Some time before November 2, 1920, Mrs. Thorne was called on the telephone and informed by Foster that the bedside lamps were faulty in construction and did not conform to the requirements of the fire regulations of the city of Chicago, and that complaint had been made that all the lamps were "unfair" and that a strike would be called on that account. Foster was in no way connected with the Fixture Hangers' Union and had no power to call a strike of that body of workmen. He made it known to Mrs. Thorne that he wanted to come over and talk the matter over with her, and did so, taking two of the lamps with him. He explained to her why the bedside lamps were faulty in the matter of wiring, and she told him that she would have the lamps re-wired by union labor at her expense. She had another talk with him at the construction shack near the Drake Hotel, where she also met Mader and one or two of his

associates. She told Mader just what she told Foster previously, that she would like to re-wire the lamps and get somebody to get union men to do it. She also told him that the lamp shades were made by the labor of women, and that any fine or anything that had to be paid would be a hardship on the Woman's Exchange; that the Woman's Exchange could not afford to pay a $2000 fine, but was willing to, and would, pay out money for the actual work of re-wiring the lamps. Mader said nothing and walked away. Foster made every effort to help her get the matter adjusted. He told her that the strike was called and that the work had been stopped on the entire construction of the Drake Hotel on account of the lamps and shades. She distinctly stated in her testimony that Foster stated and explained to her that it was only the bedside lamps, about 612 in number, that were faulty in construction, and that the defect in construction was that the wiring passed through a wood portion of the lamps, and because of that fact the lamps were objectionable under the fire ordinance. These lamps, and all the other lamps, had shades that were manufactured by women, but only 612 were faulty, as aforesaid. Neither Foster nor the defendant at any time demanded of Mrs. Thorne any money or fine because the lamps were "unfair" or manufactured by non-union labor. The record clearly shows that Mader did call the strike. Mrs. Thorne further stated that she employed or asked assistance of George Durgan, an attorney at law for Montgomery Ward & Co., who was also a friend of her husband, to help her get the matter adjusted, and that the matter was finally adjusted by her paying the sum of $1418 for the Woman's Exchange to the Henkle & Best Company, and that she paid the money to Adolph Henkle, of that company, and got a receipt for the money, which was dated November 22, 1920, and was signed "Henkle & Best Co., by H. A. Best, Pres.," which receipt is in this language: "Received from Woman's Exchange, Chicago, fourteen hundred and eighteen dollars,

in full payment for re-wiring, with union help, 612 electric lamps, and for clearance of 1460 lamps from union labor prohibition." The evidence shows that Durgan was with Mrs. Thorne when this money was paid and receipted for and that the receipt is in his handwriting.

In the interest of Mrs. Thorne and the Woman's Exchange Durgan had several conversations with Foster, and also enlisted the services of A. G. DeClercq, construction superintendent of the Commonwealth Edison Company. DeClercq called the defendant to his office about November 15, 1920. The defendant told DeClercq that he called the strike on account of the lamps furnished by the Woman's Exchange being manufactured by non-union labor, and in answer to a query by DeClercq as to why he pressed this case against the Woman's Exchange, a charitable organization, said that the matter had been brought up on the floor of the organization and that he could not call the strike off. After some further conversation the defendant agreed that the strike would be called off if the lamps were re-wired by a contractor who employed union labor, and he asked DeClercq to let him know who did the work of re-wiring. A few days later the defendant came to DeClercq's office with one Hogan and suggested that Hogan do the work on the lamps. DeClercq informed the defendant that he had already made arrangements with Harry A. Best, of the Henkle & Best Company, to re-wire the lamps at 90 cents per lamp, except a few which he was to re-wire and repair at $1.10 per lamp. The defendant then went to see Best at the factory of the Henkle & Best Company between November 18 and 22, and agreed with Best to furnish workmen, to be paid by Best, to do the work in a rapid manner and at a low rate. Best informed him that $668 was the best price at which he could re-wire the bedside lamps and repair and re-wire the few that were broken. The defendant then informed Best that Mrs. Thorne would pay his company the sum of $1418 for the work to be done on the

lamps and that he (the defendant) wanted $750 out of the amount to be paid to the Henkle & Best Company by Mrs. Thorne, and that Best could tell her that the strike would be called off as soon as she paid the money. After Mrs. Thorne paid the said sum of $1418 to the Henkle & Best Company the book-keeper of that company took out $668 as money going to the firm and placed the remaining $750 in the drawer of her desk. About three hours afterwards Mader came to the office with an associate. Best went into the back room of the office and the defendant followed him, after telling his associate to remain in the front office. When Best and the defendant got into the back room the latter said to Best, "Where is the jack?" Best told him that he had the money, returned to the front room and got the $750 from the book-keeper and then went back to the rear room and gave it to the defendant. The defendant then said that he would call off the strike, went to the telephone in the office of the Henkle & Best Company and called up some party or parties. Best and the other parties in the office did not hear what the defendant said over the telephone. The strike was called off, however, and work was resumed on the Drake Hotel building the next day, and it is clear from the evidence that the defendant did call off the strike in the office of the Henkle & Best Company after receiving the $750 for that purpose. There was no one else in the office who saw Best give Mader the $750, but Best positively testified that he did give it to him, and his testimony is not controverted by anyone. Afterwards the Henkle & Best Company re-wired and repaired the bedside lamps, not exceeding 612 in number, and delivered them in small lots at their factory to parties who delivered them at the Drake Hotel, in which they were installed. No other lamps were delivered to the Henkle & Best Company for re-wiring or repairing, but all the other lamps made under the contract with the Woman's Exchange were installed in the hotel after being passed or permitted by the defendant

and stamped with the stamp of his union and for which he received the $750.

As contended by plaintiff in error, there is no proof in this record that there was a conspiracy between him and Foster or between him and any other person, as charged in the indictment. The evidence is quite clear that the defendant had an understanding with Mrs. Thorne before he went to see Best at the office of the Henkle & Best Company that she was to pay the sum of $1418 for the re-wiring and repairing of the bedside lamps. The evidence does not disclose whether or not this understanding was with Durgan, who was working in the interest of Mrs. Thorne and the Woman's Exchange to get the strike called off, but it does show that Durgan clearly understood this arrangement before he went to the Henkle & Best Company's office with Mrs. Thorne to pay the money, because he drew the receipt himself, and specified that the full sum paid was for re-wiring, with union help, 612 electric lamps and for clearance of 1460 lamps from union labor prohibition. The defendant had informed Best that Mrs. Thorne would pay the sum of money that she did pay and that he wanted $750 of that sum, and that the remainder was to be retained by the Henkle & Best Company for the re-wiring and repairing. Neither Henkle nor Best is shown to have known anything about the arrangement between the defendant and Mrs. Thorne for the payment of the money to the Henkle & Best Company except what they learned from the defendant. The defendant had already informed Best that it would be paid to the Henkle & Best Company, and that was the extent of that company's notice or knowledge of the arrangement the defendant had with Mrs. Thorne. The Henkle & Best Company only retained money for actual services rendered in the re-wiring and repairing of the lamps. The evidence is entirely consistent with the theory that the Henkle & Best Company paid the defendant the $750 in accordance with a previous understanding between

the defendant and Mrs. Thorne. The evidence is entirely consistent with the theory that DeClercq, Durgan and Best are guilty of no conspiracy whatever with the defendant for any purpose charged in the indictment or for any other unlawful purpose. Durgan was working in the interest of Mrs. Thorne and the Woman's Exchange to get the strike called off and the lamps passed by the union and accepted and paid for by the contractors who were building the hotel. He interested DeClercq and enlisted his services for the same purpose and both of them were working for such result, and so far as this evidence shows they charged or received nothing for their services from anyone.

The Appellate Court found that there is no showing in the record that Foster was a party to a conspiracy with Mader, and we entirely agree with that finding. As said by the Appellate Court, there is no showing in the record by anything Foster said or did that it was his design to extort money from the Woman's Exchange as a condition of the resumption of work, or for the installation of the lamps, or for any other unlawful purpose. The record evidence is entirely consistent with the idea that he was only interested in having the strike settled as early as possible, so that his firm or the contractors could resume work on the building. There is no evidence that he had any knowledge of the terms of settlement between the defendant and Mrs. Thorne or that he actually participated in bringing it about.

It is earnestly contended by the State that conceding that Foster was not a party to a conspiracy with the defendant, the evidence is such as to disclose a conspiracy between the defendant and some unknown person. We have already discussed this as to Henkle, Best, Durgan and DeClercq. The record is entirely wanting in any evidence to show that either of the associates of the defendant who were with him when he met Mrs. Thorne at the shack near the hotel, or his associate who was with him when he got the money from the Henkle & Best Company, was a conspirator with

him for any purpose charged in the indictment or for any other purpose, or that the defendant conspired with any person or persons, as charged in the indictment. The positive evidence is that the defendant made his own arrangements with Mrs. Thorne and the Henkle & Best Company whereby he obtained the money in the manner stated.

In order to prove a person guilty of the crime of conspiracy it is not sufficient to show a passive acquiescence on his part with the illegal act. It is necessary to show a bad design or criminal intent between two or more persons to' accomplish an unlawful result. (*Evans* v. *People*, 90 Ill. 384; 5 R. C. L. 1066.) To constitute the crime of conspiracy there must be more than one person guilty thereof, and before a defendant can be convicted of conspiracy the evidence must show that there are two or more persons guilty of such conspiracy. (*Evans* v. *People, supra.*) It is not sufficient to sustain a conviction on a particular charge to prove that the defendant is guilty of some other charge, or of generally bad and criminal conduct, but the proof must establish his guilt of the particular charge in the indictment. *Lowell* v. *People,* 229 Ill. 227.

We cannot agree with the contention of the defendant that the record evidence shows that he merely entered into a legal contract for services rendered the Woman's Exchange. We have declined to discuss a great deal of the evidence bearing on that subject which tends to show otherwise and because of the fact that the case may be further tried in the court below.

For the foregoing reasons the judgments of the Appellate and criminal courts are reversed and the cause is remanded to the criminal court. *Reversed and remanded.*