(No. 20638.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* E. H. BLUME *et al.* Plaintiffs in Error.

*Opinion filed October 23, 1931.*

W. F. McLAUGHLIN, for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and JAMES B. SEARCY, (HENRY T. CHACE, JR., EDWARD E. WILSON, and OTHO S. FASIG, of counsel,) for the People.

Mr. COMMISSIONER PARTLOW reported this opinion:

Plaintiffs in error, E. H. Blume, George P. Lee, W. Z. Magid and Laci Stein, were found guilty in the criminal court of Cook county upon an indictment charging a conspiracy to obtain the property of Shekleton Bros., a corporation, by the sale to it of real estate bonds represented to be first mortgage bonds whereas they were third mortgage bonds of very little value. They were fined in amounts ranging from $500 to $2000. The judgment was affirmed by the Appellate Court and a writ of error has been prosecuted from this court to review the judgment.

The indictment consisted of two counts. The first count alleged that plaintiffs in error conspired to obtain

certain money, bank bills and other property of the value of $5600, and one check or order for the payment of money of the value of $5600, the property of Shekleton Bros., by false pretenses. The second count was the same as the first, except that it alleged that plaintiffs in error conspired to obtain the property by means of the confidence game.

The evidence shows that Shekleton Bros., a corporation, was engaged in the real estate business at No. 160 North LaSalle street, Chicago. Magid was a real estate broker who had been employed by Shekleton Bros. Stein was financially irresponsible and was apparently without any business or employment. Blume was a sales manager for the Chicago Towel Company. He had previously been employed by Armour & Co., and was connected with the Hotel Sherman. Lee was in the real estate business at No. 7 South Dearborn street. The real estate upon which the bonds were issued was an apartment building at 6511 to 6525 Ellis avenue, in Chicago, of the value of about $142,000. The title to this property had previously been in Lee, who transferred it to Louis Golden, but Lee managed the property for Golden. There were two mortgages on it— the first one for $52,000 and the second one for $55,000. Lee testified that the property was to be re-financed, and on February 1, 1927, the title was conveyed to the Chicago Title and Trust Company as trustee, to secure bonds of $110,000. For the purpose of selling these bonds Lee issued a circular which described the bonds as six and one-half per cent first mortgage real estate gold bonds, secured by a first mortgage on the land and the building at 6511 to 6525 Ellis avenue; that interest was payable August 1 and February 1 at the Standard Trust and Savings Bank, Chicago; that the bonds were the direct obligation of Louis Golden, who had a good financial standing; that the building was insured to cover the loan; that the Chicago Title and Trust Company guaranteed the title; that the owner

of the property was required to deposit sufficient funds to take care of the taxes, interest and principal, and that Lee recommended these bonds for safe investment.

Blume testified that in April, 1927, he met a man calling himself F. H. Brown, who handled bonds and finances on real estate. Blume claims that later he met Brown in Chicago on several occasions and that he had a conversation with him relative to securing a mortgage for Blume on a house in Florida which Blume had purchased from Magid. Brown said he was not engaged in that kind of business but knew a man who could get a mortgage for Blume. The next day Brown took Blume to the office of Lee. This was the first time, according to Blume, that he had met Lee. Several weeks later Blume and Brown again met. Brown told Blume that Brown had a re-financing proposition with Lee and that Brown was going to sell first mortgage bonds for Lee. Brown had in his possession some of the circulars prepared by Lee on the issue in question and had one of the bonds. Blume testified that he told Brown he was not interested in the matter. Brown said that Blume might interest some of his friends in the purchase of the bonds, and if he did so Brown would pay him a commission on any bonds which he might sell. Brown gave Blume some of the circulars on the bond issue prepared by Lee. Blume testified that some time later he had a talk with Magid in which he gave Magid some of the circulars and told him that if he was able to put the deal over Blume would be taken care of. Magid said he had a number of friends who had real estate and he thought the bonds could be put up in the purchase of real estate instead of cash. Blume testified that Brown gave him a $500 bond which Blume gave to Magid. Blume told Magid that he would get one bond which Magid could investigate, and if it was satisfactory to his people Blume would consider trying to make it possible for Magid to make a sale, but that Magid would have to guarantee a re-sale, to which Magid

agreed. Blume purchased a piece of real estate through the North Side Realty Company with the bonds submitted as collateral. No question was raised about the bonds in that deal. About two weeks after the first deal was closed Magid told Blume that he could make other sales. Blume replied that he would not tie himself up on any more property. Magid said this would not be necessary, because it was a common practice to execute a power of attorney and that the attorney would be personally responsible for the bonds. Blume testified that he never knew until long after the transaction in question who the individuals were with whom Magid was dealing; that as far as he knew, Magid never met Lee until many months after the transaction was ended; that Blume did not have any idea or any suspicion at any time that the bonds were not as represented, and that when he received the check for $2000 from Magid he endorsed it and turned it over to Brown.

The evidence shows that Magid went to the office of Shekleton Bros. about October 16, 1927, and told them that he had a client who wanted to purchase real estate of the value of $26,000, and that his client had $7500 of first mortgage bonds which he wanted to use as the down payment. Magid left one of these bonds for $500 as a sample for investigation. Later he returned to the office of Shekleton Bros. with Stein and introduced him as a wealthy wine merchant. Stein said he was ready to go through with the deal in the purchase of the property but preferred to give his note for ninety days with the bonds as collateral because he knew the bonds were good, knew the property and had other money with which to pay the note. The deal was carried out in this manner. Magid then demanded his commission for making the sale and was told that no money had come into the deal and he would not get his commission until some money was realized. Magid stated he knew where he could discount the collateral note on the payment of $500 and was told that Shekleton Bros. had

someone who would handle the deal. Shekleton Bros. discounted the note and issued two checks, one to Magid for $1400 and one to Blume for $2000. It is claimed that these checks were subsequently lost but evidence was introduced as to their contents. The check payable to Blume bore his endorsement on the back, and Lawless, of Shekleton Bros., testified that he knew it was the signature of Blume because he had a conversation with him some months after the transaction and Blume stated that he had given this check to Lee for some money he owed Lee. The Shekleton deal was closed on October 20, 1927. The evidence further shows that Shekleton Bros. looked up the title of the bonds to determine whether the bonds represented to be first mortgage bonds were good. They found that the mortgage was recorded and that it recited that it secured first mortgage bonds, but they did not have any abstract prepared to show whether there were any prior mortgages. All of the witnesses who were employed by Shekleton Bros. testified that they did not know Blume or Lee until after the transaction was closed and that all of their dealings were with Magid or Stein.

The court admitted evidence of two similar real estate deals made prior to the Shekleton transaction and one made a few weeks afterwards in which these bonds were used. One of these transactions was with the North Side Realty Company in which Blume and Magid were interested. Another one was with Arthur Michel & Co. E. R. Elliott, an attorney for the latter company, testified that he was a lawyer and that he looked up the bonds in question and the title to this property; that he met Magid and Stein in the office of his company on September 23, 1927, on a similar deal; that he informed Magid that these bonds were third mortgage bonds and that his company would not accept them; that the bonds were returned to Magid in the presence of Stein, upon Magid's receipt for the same. Upon cross-examination it appeared that during the year 1928,

several months after the transaction in question, Michel & Co. instituted an action in trover against Magid for these bonds and that Elliott was the attorney in that case. Shekleton Bros. first discovered that these bonds were not first mortgage bonds in February, 1928, and Lawless, of Shekleton Bros., testified that he told Magid of that fact and that Magid told him he did not know that the bonds were third mortgage bonds; that Magid said he knew nothing about their validity but relied on the bonds and the circular that they were first mortgage bonds, and that he would get in touch with Blume, from whom he received the bonds. Magid testified that he had no knowledge or ground for suspicion that the bonds were anything but what they purported to be, and he denied the testimony of Elliott in regard to having told him that they were third mortgage bonds.

Stein testified that he knew Magid but did not know the other defendants until long after the deal had been closed; that he went to the office of Shekleton Bros. with Magid at Magid's request and was there asked whether he wanted to buy the property; that he replied that he was not buying the property but was acting under a power of attorney from Blume, and he put the power of attorney on the table. He testified that one of the employees of Shekleton Bros. told him that Magid had said that Stein was in the wine business and was a rich man. Stein testified that he told them he did not have a dollar to his name; that one of the men from Shekleton Bros. then told him that they had a customer for the property and they would extend his note; that he and his friend would make $4000 profit and that they wanted him to sign up; that he received from Magid $50 for his trouble, and that he was told by Magid that the property would be sold before any of these notes became due.

Lee testified that he did not know that the bonds were being used in this manner; that he had negotiated with Brown regarding the disposition of the bonds to a syndi-

cate represented by Brown; that the money to be realized from the bonds was to be used for retiring the first and second bond issues on the property; that he had received from Brown the check for $2000 payable to Blume, but that he assumed it came from one of the syndicates which Brown had claimed to represent; that he had never had any dealings with Shekleton Bros. and did not know of any dealings being had with them; that when he found what had been done with the bonds he endeavored to find Brown but had been unable to locate him, and that he traced Blume from the endorsement on the check after Brown had disappeared.

As grounds for reversal plaintiffs in error insist that the most that this evidence shows is a conspiracy to defraud the public generally and that it does not prove a conspiracy to defraud Shekleton Bros., as was alleged in the indictment. In support of this contention they cite *Lowell* v. *People,* 229 Ill. 227. In that case plaintiff in error and Cowell were indicted charged with a conspiracy to obtain by false pretenses the money of Jackson. Cowell testified that he never knew Jackson; that when he and plaintiff in error associated themselves together he had no intention, and never had any intention, of cheating Jackson, and the evidence showed that Jackson never sustained any loss by reason of the transaction. It was held that proof that plaintiffs in error conspired together for the purpose of defrauding the public generally is not sufficient to prove a conspiracy alleged as against a certain person even though that person may be one of many persons who are victimized by one of the conspirators, and that the proof and the allegations of the indictment must correspond.

The *Lowell case* is not conclusive of the facts in evidence in the case at bar. The evidence in this case shows that plaintiffs in error did conspire together for the purpose of cheating and defrauding Shekleton Bros. Lee had owned this property and knew the condition of the title

and that there were two mortgages on it. He caused it to be transferred to various parties and prepared to place a third mortgage on it. He prepared the circular fraudulently advertising these bonds as first mortgage bonds. He secured the persons to sell the bonds, including Brown and Blume. It is clear from the evidence that Magid and Stein had specific intentions to defraud Shekleton Bros. Magid had been employed by the victims. Magid employed Stein to represent the purchaser. Magid made false representations to Shekleton Bros. as to Stein, the bonds and the purchase of the property. It is not necessary that a specific intent be proved by direct evidence. It may be proved by facts and circumstances. After the bonds were advertised Blume went with Brown to see Lee. Blume claims he did not want to enter into this transaction, but he did enter into it. The evidence shows he owned some of these bonds. He promised Magid compensation if any sales were made. At the time Magid and Stein were selling the bonds to Shekleton Bros., Stein had in his possession a power of attorney signed by Blume authorizing Stein to sell the bonds which Blume owned and which he transferred to Stein. These bonds were twelve in number, of the value of $500 each, and there was one bond of $1000. The bonds delivered to Shekleton Bros. in this case were for $7500 and they were discounted $500. The power of attorney recited that the bonds were to be assigned only for the purpose of buying or trading for real estate in lieu of a cash deposit or earnest money. This power of attorney was not a general power but was a specific, special power for a special amount and a certain number of bonds. Stein testified that during the time of the transaction he laid this power of attorney on the table and told Shekleton Bros. that he was acting under a power of attorney. The power of attorney showed that the principal was Blume. While the power of attorney did not mention the name of Shekleton Bros., yet its recitals exactly fit that transaction. This

power of attorney shows that these bonds were the bonds of Blume and were being transferred to Shekleton Bros. for the purpose of carrying out this fraud. In this transaction the commission was $3400. When the trade was consummated Magid demanded his commission. He said he had partners in the deal and wanted separate checks. He received a check for $1400 as his share of the commission and gave a check for $50 to Stein for his services. He directed Shekleton Bros. to issue a check to Blume for $2000. This money was all derived from this fraudulent transaction. Blume received and endorsed Shekleton Bros.' check as his share of the transaction. The evidence shows that this check for $2000 afterwards came into the possession of Lee and that it bore the endorsement of Lee and Blume, both of whom apparently shared in the proceeds of this fraud. Magid's exhibit "5," which was offered in evidence by him, was a printed form of commission-spread of Shekleton Bros. showing that Stein was the purchaser of the property, Blume was the salesman and his commission was $2000, and Magid was the division manager and his commission was $1400 and he was to stand a discount of $500 for cashing the bonds. Under all the evidence it was a question of fact for the jury to determine whether Blume and Lee entered into a conspiracy with Magid and Stein against Shekleton Bros., as alleged in the indictment. There was ample evidence to justify the jury in this belief and we are not justified in setting aside their finding.

Plaintiffs in error insist that if any crime was committed it did not amount either to a confidence game or false pretenses. A confidence game is any swindling operation in which advantage is taken of the confidence reposed by the victim in the swindler. It consists in gaining the possession of money or property by means of some trick, device or swindling operation in which advantage is taken of the confidence of the victim reposed in the swindler. (*People* v. *Fosnacht*, 334 Ill. 351; *People* v. *Koelling*, 284

id. 118; *People* v. *Gallowich*, 283 id. 360.) In obtaining money by false pretenses the false pretenses used must have been believed and relied upon by the defrauded party and been the means of inducing the victim to part with his property. They must be the direct cause of the loss of the property. Any designed misrepresentation of an existing condition by which a party obtains goods of another is a false pretense. (*People* v. *Peers*, 307 Ill. 539.) The verdict in this case was general, finding plaintiffs in error guilty as charged in the indictment. In the absence of error, if either count is good, the verdict must be sustained. (*People* v. *Smith*, 239 Ill. 91.) There is ample evidence that a swindling device was put in operation by plaintiffs in error in which advantage was taken of the confidence reposed by the victim in the swindler and as a result thereof the victim was defrauded; also that false representations, known by the defendant to be false, were made which were believed by the victim and relied upon as true and the victim was thereby induced to part with its property. The false representations resulted in the loss of the property.

It is insisted that the proof is insufficient to sustain the charge of false pretenses because it does not show that Shekleton Bros. relied upon the statements made by plaintiffs in error. This contention is not sustained by the evidence. There is abundant evidence of such reliance. Shekleton Bros. would not have given the checks, entered into a contract or borrowed the funds with which to pay the commissions had it not been for the representations of Lee, Magid and Stein that the bonds were first mortgage bonds and that Stein was a man of wealth and reputation. The evidence was sufficient to sustain a conviction on either count of the indictment.

While the State was putting on its rebuttal evidence Lee was recalled to the stand by the State and testified that he did not tell Michel that Stein was the owner of some

of these bonds and denied that Stein ever showed him any of the bonds. This ruling is assigned as error. In *North v. People,* 139 Ill. 81, during the closing argument the court permitted additional evidence to be admitted, and it was held that this did not constitute reversible error. The record shows that the trial court in this case was very liberal in giving both sides the opportunity to introduce all of their evidence. The court permitted plaintiff in error to defer the cross-examination of two of the witnesses for the State and did not require cross-examination immediately after the witnesses had testified. In permitting Lee to be recalled the court did not abuse its discretion.

It is insisted that it was error to admit evidence of similar transactions of plaintiffs in error. One count of the indictment charged conspiracy to obtain the property by a confidence game. This court on several occasions has held that evidence of similar transactions may be competent when the similar transactions have a tendency to prove the crime charged in the indictment, or where they have a tendency to prove guilty knowledge or intention, where such is required in the proof of the indictment on trial. (*People v. Horn,* 309 Ill. 23; *People v. Mandrell,* 306 id. 413; *People v. Cione,* 293 id. 321; *People v. Weil,* 244 id. 176.) Blume, Magid and Stein claimed they had no knowledge that these bonds were not as represented. Lee claimed that the bonds were not issued by him for sale. It was therefore competent for the State to show, if it could, that plaintiffs in error had tried in other cases to negotiate these bonds and that it had been brought to their attention that the bonds were third mortgage bonds and not first mortgage bonds. The evidence of similar transactions was properly admitted.

It is insisted that there was a variance between the indictment and the proof as to the amount of the checks which were made the basis of the case. This point was not raised in the motion for a new trial and was not called

to the attention of the trial court, and it cannot be raised for the first time in a court of review. (*People* v. *Weisman,* 296 Ill. 156; *People* v. *Melnick,* 274 id. 616.) Plaintiffs in error insist that this point was raised in item 11 of the motion for a new trial, but this contention is not sustained by the record.

It is insisted that the State's attorney made improper argument to the jury and that the trial court made an improper remark to a witness in the presence of the jury. The State's attorney said that plaintiffs in error were more contemptible and reprehensible than a man who held up others with a gun and took their money; that it was worse to make misrepresentations to business men and take their money by showing third mortgage gold bonds and representing them as first mortgage gold bonds than to be a thief who would go out and steal with a gun, and that in his opinion Blume was the mysterious Brown. To this last remark an objection was sustained. It has been held that what is proved by direct evidence or is fairly inferable from facts and circumstances proved and which has a bearing upon the issue may be a fair subject for comment by counsel, and if such deductions or inferences tend to fix upon the defendant the crime charged against him it is within the scope of proper and fair argument to denounce him accordingly. (*People* v. *Strauch,* 240 Ill. 60.) In *People* v. *Dear,* 286 Ill. 142, the State's attorney denounced the defendant as a murderer and a witness as a perjurer, and it was held that the prosecutor was warranted from the evidence in so charging the defendant and the witness. The argument made by the State's attorney in this case was not inflammatory. It was based upon the evidence and was within the rule of proper argument. The remark of the trial judge was not such as to constitute any error in the case.

In support of his motion for a new trial Blume filed an affidavit setting up what he calls newly discovered evi-

dence, the result of which he claims is to impeach the evidence of E. R. Elliott to the effect that on September 23, 1927, in a similar deal between Michel & Co. and Magid relative to these bonds, Elliott investigated the bonds and found that they were third mortgage bonds and that he so informed Magid, and that at the time of the deal in this case Magid had knowledge of the fact that these bonds were third mortgage bonds. It is also insisted that the newly discovered evidence set up in this affidavit tended to contradict certain other facts with reference to the Michel deal. It is claimed that this newly discovered evidence arose in a case of trover brought in 1928 by Michel & Co. against Magid to recover similar bonds used in the deal between Michel and Magid, and that Blume did not know that such a case had ever been tried, or that there was any evidence of this kind in existence, or that there was a stenographic report of this evidence until after the case at bar had been tried, and that this evidence was of such a decisive character as to entitle plaintiffs in error to a new trial. In order for a party to be entitled to a new trial on the ground of newly discovered evidence the rule is that the evidence must appear to be of such a conclusive character as will probably change the result if a new trial is granted, it must have been discovered since the trial, it must be such as could not have been discovered before the trial by the exercise of due diligence, it must be material to the issue, and it must not be merely cumulative to the evidence offered on the trial. (*People* v. *Pennell*, 315 Ill. 124; *People* v. *LeMorte*, 289 id. 11; *People* v. *Williams*, 242 id. 197.) In *Monroe* v. *Snow*, 131 Ill. 126, it was held that a new trial will not be granted to admit evidence to impeach the testimony of a witness unless it appears that such testimony will be clear and decisive as to the rights of the parties on another trial. Blume claims he did not know of the existence of this trover case or of the existence of this testimony or that a stenographic re-

port had been taken of this testimony until after the trial in the case at bar, yet the evidence shows that the trover case was tried in 1928. It was brought by Michel & Co. against Magid to recover the possession of certain bonds which it is claimed were illegally held by Magid. In the trial of that case Magid was a witness and testified in his own behalf. Lee, also, was a witness in that case and testified concerning the value of these bonds. In this case Magid and Lee were both defendants, and they were represented by counsel along with Blume and Stein. They were charged with a conspiracy to defraud. The evidence in question was undoubtedly known to exist by both Magid and Lee, and it is difficult to understand why Blume did not know or could not have known of its existence. The evidence merely impeached other evidence in the case, and the affidavit filed did not show due diligence in the preparation of this case for trial and showed that the evidence was not of that decisive character which would result in a different verdict if another trial were granted. The motion for a new trial was properly overruled.

In this case there are no errors in the rulings on the admission or exclusion of evidence or as to any propositions of law. The only question is whether or not the evidence is sufficient to establish the guilt of plaintiffs in error beyond a reasonable doubt. That was a question of fact for the jury. There was sufficient evidence to justify the jury, if they believed the evidence, in finding plaintiffs in error guilty, and this court is not justified in reversing the judgment on the ground that the evidence does not sustain the verdict.

We find no reversible error, and the judgment is affirmed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Partlow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Judgment affirmed.*