The People of the State of Illinois, Defendant in Error, v. Morris Glickman, George Scott and Willie Wheat (Impleaded), Plaintiffs in Error.

Gen. No. 48,003.

First District, Second Division.

November 1, 1960.

Charles A. Bellows and Jason Ernest Bellows, of Chicago, for plaintiff in error Morris Glickman (Sherman C. Magidson, of counsel), and James P. Piragine, of Chicago, for plaintiffs in error George Scott and Willie Wheat.

Benjamin S. Adamowski, State's Attorney of Cook county (Francis X. Riley and Marvin E. Aspen, Assistant State's Attorneys, of counsel) for defendant in error.

MR. JUSTICE BRYANT delivered the opinion of the court.

Writ of error from the Criminal Court of Cook County seeking to reverse judgments against defendants who were charged with the crime of conspiracy to violate the election laws during a special election of a United States Representative in Congress for the Seventh Congressional District of the State of Illinois.

The defendants contend that the State failed to prove the defendants guilty beyond a reasonable doubt and further that the conduct of the prosecutor prevented them from receiving a fair and impartial trial.

The special election was held on December 31, 1957. The tallies from the voting machines indicated that 468 out of the 599 registered voters in the 44th Precinct of the First Ward had voted and that therefore, 131 voters had not voted. However, it was stipulated at the trial that a total of 177 registered voters in the 44th Precinct of the First Ward did not vote on that date.

The five election judges, Mary Evans, George Scott, Willie Wheat, Willie Lee Winters, and Norma Johnson and Goldie Seawood, a worker at the polling place, Morris Glickman, the precinct captain, and Albert Epstein, his associate, were charged with the crime of conspiracy.

The prosecution's case rests almost exclusively upon the testimony of the accomplice Mary Evans, who agreed to testify for the State in the apparent expectation that she would not serve an actual prison sentence.

She related that on the morning in question, two to four unidentified white men entered the polling place in this Precinct, and with the aid of Glickman, voted the machine approximately fifty times. She further testified that two white men returned in the afternoon and again with the aid of Glickman, voted the machines approximately 80 times. She was uncertain as to whether there were two, three or four white men in the morning, and also was uncertain as to whether any of these same white men had returned in the afternoon.

She further testified that the defendant Wheat tore off approximately 100 applications to ballot from the binder and gave them to the defendant Glickman who took them out of the polling place. The defendant Epstein, she said, returned with these applications and Mrs. Wheat then completed these applications and signed them. However, she had given testimony one

month after the election that Epstein had not handled any applications.

She contended that this process was repeated in the afternoon. At that time, Mr. Scott was named as the person who tore off the applications and presented them to Glickman. She said that Mrs. Seawood returned with the applications with instructions from Glickman to have them filled out and signed. However, she had previously testified in the County Court that Seawood did not handle any applications nor give the instructions which were later attributed to her.

Finally, she testified that in the afternoon in question, Mr. Scott had voted the machines with Mr. Glickman approximately 70 times to permit the numbers on the machine counters to correspond with the number of applications. However, in her earlier testimony, she said that Scott had only pressed the button once.

Police officer Brennan, assigned to guard the polling place in this precinct, testified that he did not see any white men in the vicinity, aside from Glickman and Epstein. He asserted that he was in front of the polling place during the time the white strangers allegedly entered the polling place. He further testified that none of the judges complained to him of any wrongdoing.

The trial judge directed a verdict as to the defendants Epstein and Seawood because of the inconsistencies in the testimony of the accomplice, Mary Evans.

The jury returned a verdict of guilty as to Glickman, Scott, Wheat and Winters and the trial judge entered an order thereon sentencing Glickman, Scott and Wheat to one year in the County Jail and in addition, imposed a fine of $2,000 on Glickman and a fine of $1,000 on Scott. This appeal is taken from that order.

It would appear that there is little difference between the defendants as to the nature of her testimony. The testimony having been held unbelievable in regard to Epstein and Seawood, would sufficiently raise a question as to her responsibility and dependability as a witness which would apply to all of her testimony in this case.

It was also brought out in her testimony that she had asked the defendant Glickman for $200.00 and that her request was not granted. This suggests an additional motive in her role as an accomplice witness.

The defendants contend that the accomplice Mary Evans was entirely impeached and discredited and that a verdict based upon such uncorroborated testimony cannot stand.

It is well established law in Illinois that a conviction can be based upon the uncorroborated testimony of an accomplice, provided that such testimony satisfies the jury beyond a reasonable doubt. People v. Derrico, 409 Ill. 453, 100 N.E.2d 607.

"It is, however, universally recognized that such testimony has inherent weaknesses, being testimony of a confessed criminal and fraught with dangers of motives such as malice toward the accused, fear, threats, promises or hopes of leniency, or benefits from the prosecution, which must always be taken into consideration. Some jurisdictions attach such weight to these weaknesses that the rule has been abrogated by statute (22 C. J. S. 1391) while those jurisdictions which follow the rule, recognizing the questionable character of such testimony, attempt to restrict the weight to be given to it by statements that it is not regarded with favor, is discredited by the law, should be weighed with care, is subject to grave suspicion, should be viewed with distrust, and that it should be scrutinized carefully and acted upon with

caution." The People v. Hermens, 5 Ill.2d 277, 285, 125 N.E.2d 500.

The defendants also contend that the conduct of the Assistant State's Attorneys prevented them from receiving a fair trial.

■ In his opening argument, the prosecutor compared the trial of the election fraud conspirators with that of 500 murderers. While it is proper to make comparison of this crime with other crimes, this is clearly not a proper comparison to make because it was intended to inflame the passions of the jury. The case of People v. Blume, 345 Ill. 524, 178 N. E. 48, is not controlling, for in that case, the prosecutor was permitted to argue that the confidence game is worse than armed robbery and that both involved the taking of property and were thus comparable. In this case, the attempt was clearly designed to incite prejudice as the crimes in question are unrelated and although the jury was instructed to disregard the remark, the damage had been done.

■ The prosecutor also implied that the defense counsel was seeking an acquittal for purely personal, mercenary reasons. This was also improper and was one of the abuses which was condemned in People v. Polenik, 407 Ill. 337, 95 N.E.2d 414.

■ In addition, there seems to have been a great deal of bickering during the trial. The prosecutor charged the defense counsel with badgering and confusing the witness and called counsel "rotten" and "unfair." This type of conduct does not meet the standards of "dignity and good order" urged by the court in People v. Black, 317 Ill. 603, 616, 148 N. E. 281.

■ But more serious is the persistent theme that the defendants somehow prevented others from testifying for fear of their lives. In the opening argument, Mary Evans is described as one who was "frightened

384

to death about what was going on. . . ." And in his closing argument, the jury was told that it was difficult to get anyone in the First Ward to testify. In this ward, it was stressed, "they are afraid of their lives." These types of remarks were without foundation and were clearly calculated to prejudice the defendants in the eyes of the jury.

■ The general principle which emerges from the cases is that counsel may not "do or say anything in argument the only effect of which will be to inflame the passion or arouse the prejudice of the jury against the defendant without throwing any light on the question for decision." People v. Dukes, 12 Ill.2d 334, 342-3, 146 N.E.2d 14.

In the recent case of People v. Roth, 19 Ill.2d 195, 200 the Supreme Court reaffirmed its determination to control the abuses of counsel. In reversing a conviction for conspiracy to harm another, the court said:

> "We feel that the ends of justice would be well served if the defendant is given a new trial, one during which the prosecutor is not only conscious of the rules but possesses the instinct of fairness, that gives him the desire to respect them."

The judgments are reversed and the cause is remanded with directions to proceed in a manner not inconsistent with these views.

Reversed and remanded with directions.

BURKE, P. J. and FRIEND, J., concur.