PATRICIA A. GINESKY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ginesky v. Commissioner
Docket No. 4093-93
United States Tax Court
T.C. Memo 1994-551; 1994 Tax Ct. Memo LEXIS 559; 68 T.C.M. (CCH) 1122; 68 Trade Cas. (CCH) P1122; October 31, 1994, Filed *559 Decision will be entered under Rule 155. For petitioner: Solomon Liss. For respondent: Mary Ann Amodeo. WELLS
WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined deficiencies in petitioner's Federal income taxes in the amounts of $ 27,227, $ 17,013, and $ 31,072 for taxable years 1986, 1987, and 1989, respectively. The issues in the instant case arise out of what petitioner contends was a disguised romantic relationship but was in fact a fraudulent scheme by Christopher Griffin to obtain money and property from petitioner. The issues we are asked to decide are: (1) Whether evidence of Griffin's indictment for theft of petitioner's property as well as evidence of Griffin's prior criminal acts are admissible to show Griffin's modus operandi as proof of theft, and (2) whether Griffin's actions and misrepresentations constitute a theft of petitioner's money and property by false pretenses under Illinois law. If Griffin's actions constitute a theft, we must also decide: (1) Whether petitioner is entitled to deduct cash payments to credit card companies for credit card purchases and cash advances made to or for Griffin; (2) whether petitioner is entitled *560 to a deduction for the theft of a statue; (3) whether petitioner is entitled to deduct certain travel and lodging expenses; (4) whether petitioner is entitled to a theft deduction for medical expenses incurred for her pregnancy by Griffin, termination of the pregnancy, psychotherapy, and other medical expenses that petitioner alleges were incurred because of the theft; and (5) whether petitioner is entitled to deduct certain legal and accounting fees. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts and certain documents have been stipulated for trial pursuant to Rule 91. The parties' stipulations are incorporated by reference and are found accordingly. Petitioner resided in New York, New York, at the time she filed her petition. Petitioner is currently employed as vice president of merchandising by Calvin Klein, where she earns an annual salary of $ 175,000. Background
Petitioner was born on June 7, 1949, in Boston, Massachusetts. She received a bachelor of science degree in education from *561 Northeastern University in Boston. While in college, petitioner worked at Jordan Marsh, a department store, as part of Northeastern's co-op program. After graduation from Northeastern, petitioner married and moved to Florida. While living in Florida, petitioner continued to work at Jordan Marsh, where she had started as a trainee and was later promoted to department manager, assistant buyer, and finally to the position of buyer. During 1980 or thereabout, upon obtaining a position as a buyer with U.S. Specialty Retailing at Casual Corner, petitioner and her husband moved to Connecticut. Petitioner's starting salary at Casual Corner was approximately $ 30,000. During 1984 or thereabout, while petitioner was working at Casual Corner, petitioner and her husband obtained a divorce. There were no children of petitioner's marriage. While working at Casual Corner, petitioner was promoted to the head of one of Casual Corner's divisions. Petitioner was the first woman to become a division head at Casual Corner. As of 1988, petitioner's salary at Casual Corner was approximately $ 100,000. Petitioner's Move to New York City
Petitioner enjoyed her job at Casual Corner, but felt *562 lonely living alone in Connecticut after her divorce. As a part of petitioner's job at Casual Corner, she frequently traveled to New York City, resulting in petitioner's having a circle of friends there. Although petitioner was reluctant to leave her position at Casual Corner, she decided to move to New York City because she thought she would be happier living there. Petitioner moved to New York City during December 1987 and began working for Apparel Affiliates. Petitioner's Personal Ad
Although petitioner had many female friends in New York City, she had no male friends. In order to meet single men, petitioner placed a personal ad in New York Magazine during February 1988. She paid approximately $ 500 for the ad, which was published in New York Magazine on February 22, 1988. In her personal ad, petitioner described herself as an attractive and successful corporate executive who likes books, museums, art, music, theater, dance, and tennis. Petitioner's ad further stated that petitioner was seeking the companionship of a distinguished, handsome, successful man approximately between the ages of 38 and 48 with whom she could share all that life has to offer. Petitioner *563 received approximately 70 responses to the ad during late February and early March 1988. She did not respond to any of the letters for several months because she was involved in another relationship. A former boyfriend from petitioner's years of living in Connecticut moved to New York City, and petitioner began to date him again. During the same time period, petitioner's younger sister became very ill, and petitioner began traveling back and forth to Boston to be with her family. Petitioner's relationship with her former boyfriend soon ended as a result of petitioner's need to spend more time with her family. Petitioner's Initial Communications with Christopher Griffin
During the summer of 1988, petitioner traveled to the Orient on business. Petitioner took three of the 70 letters that she had received in response to her New York Magazine ad with her to the Orient. One of the three letters was from a man named Christopher Griffin. The letter from Griffin was handwritten. In the letter, Griffin described himself as a 38-year-old widower who shared petitioner's interests in books, museums, art, theater, and tennis. Griffin also stated that he was a successful entrepreneur *564 in the field of real estate. Griffin ended the letter by requesting that petitioner write to him if she was interested in meeting him. Griffin also stated that although he lived in Manhattan, he would be away on business for a few weeks such that petitioner should write to him at the return address on the letter which was 12-W, Pembroke Station, Danbury, Connecticut. Petitioner was unaware that the return address on the letter was the address of the Danbury Federal Correctional Institute (the Danbury prison). Petitioner responded to Griffin's letter (as well as the other two letters that she brought with her) while on business in the Orient. On July 11, 1988, while petitioner was still in the Orient, petitioner received a telephone call that her sister had died. Petitioner immediately returned to the United States. Due to her sister's death, petitioner was uninterested in meeting any of the men to whom she had written while she was in the Orient. Petitioner sent a second letter to Griffin (as well as the other two men) explaining that she was not ready to meet him at such time. Petitioner had apparently enclosed her New York City telephone number in the letter she sent to *565 Griffin from the Orient. Once Griffin learned of petitioner's sister's death via the second letter, Griffin telephoned petitioner to express his condolences. Griffin continued calling petitioner several times each week to chat. Petitioner felt comforted by the friendship that was developing between herself and Griffin as a result of their telephone conversations. During early October 1988 or thereabout, petitioner suggested that Griffin meet her in New York City for a cocktail. Griffin declined because he claimed that he was going to be out of town. Approximately 1 week later, Griffin called petitioner and explained that the actual reason that he was unable to meet her was that he was incarcerated in the Danbury prison. Griffin still wanted to meet petitioner in person and hoped that she would visit him in prison. Petitioner was shocked to learn that Griffin was an inmate, as she believed that he lived in Manhattan based on what he had stated in his letter. Petitioner was distraught because Griffin had lied to her about where he lived. Griffin explained that he had lied to her because he had hoped that he would have been released by the time she had adjusted to her sister's *566 death and was ready to socialize again. Griffin further hoped that petitioner would never even discover that he had been incarcerated. Petitioner adamantly opposed visiting Griffin in prison. Griffin, however, pointed out that he had been a source of comfort to her during the months following her sister's death. Griffin hoped that petitioner would be equally supportive of him now that he needed some help. Petitioner's Visits to the Prison
During the end of November 1988 or thereabout, petitioner went to visit Griffin for the first time at the Danbury prison. Petitioner met with Griffin in the visiting room. [1] *567 Griffin explained, in vague terms, that he was serving time because his brother, Marcus, had committed some wrongdoings, and Griffin's only involvement was to help his brother flee the country. Griffin further explained that he felt his brother had behaved wrongly, but he wanted to help his brother straighten out his life. At the time, petitioner appreciated Griffin's honesty and enjoyed spending the afternoon with him. [2]
Subsequently, petitioner visited Griffin a second time at the Danbury prison, and Griffin presented petitioner with a purported court transcript to substantiate what he had previously told her about serving time because he helped his brother. Petitioner spent the entire day at the prison reading the document. Petitioner visited Griffin a total of 12 times during which they became better acquainted. As a result of the prison visits, petitioner and Griffin's friendship became a serious relationship. During one of petitioner's later visits, Griffin asked petitioner to marry him by presenting her with a handkerchief on which he had handwritten his marriage proposal. *568 Petitioner accepted Griffin's proposal of marriage. Griffin and petitioner discussed their future plans while Griffin was still incarcerated. Griffin told petitioner that he had a significant amount of money in foreign banks. He also told petitioner that he had two accounts at Citicorp Bank in Illinois. He claimed that he was willing to put petitioner's name on his accounts, but thought it would be better not to utilize any of his funds so as to avoid arousing any suspicions while he was on parole. Consequently, Griffin needed money for rent and clothing. Griffin also wanted additional funds to reestablish himself in the business world. Griffin's Release From Danbury Prison and Move to Chicago
On April 17, 1989, Griffin was released from the Danbury prison on parole. [3] As a condition of his parole, Griffin was required to live in Chicago, Illinois, and he was not allowed to leave Chicago without permission. Consequently, petitioner traveled to Chicago from New York City to see Griffin on the weekends. Petitioner and Griffin went to the movies and the theater, and dined in fine restaurants. Petitioner met Griffin's father and younger brother, Michael, who lived in *569 the Chicago area. Petitioner was introduced as Griffin's fiancee. Within 2 to 3 weeks after Griffin was released from prison, petitioner became pregnant. Petitioner continued to visit Griffin in Chicago every other weekend until August 1989 when her pregnancy made it difficult for her to travel. The Chicago Apartment
Upon moving to Chicago, Griffin rented an apartment at 505 North Lake Shore Drive in Chicago (the Chicago apartment). The apartment was listed in both petitioner and Griffin's names, and the lease was for 1 year. Petitioner, however, paid Griffin's rent, which was approximately $ 1,500 per month. Petitioner would stay with Griffin in the apartment when she visited him in Chicago. Petitioner purchased a couch to put in the living room. Petitioner also purchased crystal and china for the apartment. Additionally, petitioner brought items from her apartment in New York City including jewelry and clothes to use while staying *570 in Chicago. Specifically, petitioner kept her diamond ring from her ex-husband in the Chicago apartment. Cash Advances, Credit Card Use, and Gifts
During the course of petitioner's relationship with Griffin, petitioner provided him with cash, which she usually obtained by taking cash advances from her credit cards. Petitioner, as opposed to Griffin, filled out the advance forms. Petitioner also allowed Griffin to use her credit cards to make purchases for himself. [4] Griffin, however, never had exclusive use of the credit cards. Generally, petitioner wrote checks to cover his credit card expenses or bills. During 1989, petitioner incurred expenses and credit card charges in the amount of $ 328,302. During the period petitioner lived in Connecticut, petitioner maintained credit cards with Connecticut National Bank and American Express. Petitioner also maintained *571 various department store credit cards, including cards with Bonwit Teller, Neiman Marcus, and Saks Fifth Avenue. When petitioner initially moved to New York City, she obtained a credit card with Chemical Bank. Petitioner also opened checking and savings accounts with Chemical Bank. Once petitioner and Griffin decided to get married, but before Griffin was released from prison, petitioner added Griffin's name to her checking and savings accounts at Chemical Bank. Additionally, Griffin suggested that petitioner obtain more credit cards and told her the banks from which to obtain them. Consequently, petitioner obtained additional bank credit cards including the following: Credit Card
Account Number
Manufacturers Hanover Visa Gold
4262 7700 0123 5053
Manufacturers Hanover MasterCard
5217 9500 0115 0550
Grand Elite  Citibank Preferred MasterCard
5410 6541 6350 8515
Marine Midland 24 Karat MasterCard
994 06 7568
Dollar Drydock MasterCard
5217 8090 6627 3873
Citibank Preferred Visa
4271 3827 0026 1379
American Express Optima Card
3737 523134 62009
American Express Platinum Card
975810380234404
American Express Platinum
3713 802344 01005
Monogram BankUSA Visa
4388 2900 0129 2227
*572 Griffin constantly asked petitioner for money, claiming that he was investigating a new business venture. Petitioner accompanied Griffin to several purported business luncheons during which Griffin met with others to discuss real estate opportunities for opening several gyms. Petitioner provided Griffin with funds as needed. Griffin also claimed that he needed a car to get around Chicago. [5] *573 Griffin called petitioner in New York City from Loeber Motors, a car dealership in Chicago, to notify her that the dealership had a car that he wanted. Griffin liked expensive cars and wanted to buy a Rolls Royce. Petitioner provided Griffin with funds to use as a deposit on a Bentley Lusanne (the Bentley). The Bentley was jointly owned by Griffin and petitioner. As petitioner was uncomfortable driving around in the Bentley, Griffin decided to buy a Mercedes for petitioner to ride in while she was visiting him in Chicago. [6] Petitioner also supplied Griffin with a down payment for the Mercedes. In addition to supplying Griffin with cash and credit cards, petitioner also gave Griffin items of her personal property. Petitioner gave Griffin an Erte statue that she had purchased while she was on a business trip to California. Petitioner paid approximately $ 5,000 to $ 5,500 for the statue during 1988. Petitioner's Verification of Griffin's Finances
After Griffin purchased the two cars, petitioner became nervous because she had never previously spent such large sums of money. During the spring of 1989, petitioner decided to verify Griffin's finances. Griffin had provided petitioner with the name and number of a person at Citicorp in Illinois who could verify two of his bank accounts. Petitioner called the contact at the bank, and the contact confirmed that Griffin had more than $ 1 million in the accounts and that Griffin had added petitioner's name to the accounts. Petitioner also learned the date on which Griffin opened the accounts. Griffin also told petitioner that he had *574 several foreign bank accounts in which he kept a substantial amount of funds. With regard to one of his accounts, Griffin supplied petitioner with the name of a contact at Bank Leu in Zurich, Switzerland. The contact confirmed that Griffin had an account at such bank. As a result of speaking to the contacts at Citicorp and Bank Leu, petitioner was confident that she need not worry about paying the increasing number of debts that Griffin was incurring. Petitioner's Communications with the Chicago Police
During August 1989, petitioner stopped traveling to Chicago because she was having some difficulties with her pregnancy. Under the circumstances, Griffin apparently received permission from his parole officer to visit petitioner in New York City. Griffin visited petitioner in New York City for approximately 2 weeks during September 1989. During Griffin's visit, petitioner and Griffin obtained a marriage certificate at City Hall in New York City. Petitioner and Griffin planned to be married during October 1989. On September 22, 1989, the evening after Griffin returned to Chicago, Detective Edison and Sergeant Gerwig of the Chicago Police (the police) telephoned petitioner *575 in New York City. Detective Edison explained that the police had a warrant to enter the Chicago apartment, and the police were currently in the apartment because a woman had filed a complaint against Griffin. [7] The woman alleged that Griffin had items in the apartment that she had charged on her credit cards. The woman further alleged that some of the items belonged to her and some of the items belonged to him. Detective Edison had called to notify petitioner that the police were confiscating the items that allegedly belonged to the woman as well as items that petitioner had purchased for the apartment. Petitioner heard Griffin yelling in the background that petitioner should not believe the information she was hearing from Detective Edison. Prior to the telephone call from the police, petitioner had no reason to believe that Griffin was involved with any other women. *576 On the same night, Griffin contacted petitioner to try to convince petitioner that none of what the police had said was true. Griffin explained that the woman who claimed to have items in the apartment was having problems with her boyfriend and had put the items in the apartment. The next day petitioner again spoke with the police on the telephone. While petitioner was speaking with Detective Edison, she heard a knock at the door. Petitioner went to the door and discovered that it was Griffin, who had traveled to New York City in violation of his parole. Petitioner did not allow Griffin to enter the apartment and instructed him to return to the lobby. Petitioner informed the police that Griffin was at her New York City apartment. At the instruction of the police, petitioner ventured downstairs to find out why Griffin had come to New York City in violation of his parole. Petitioner and Griffin went for a walk in Central Park during which Griffin tried to convince petitioner that he was innocent of the charges brought by the woman in Chicago. Petitioner insisted that Griffin return to Chicago immediately and surrender himself to his parole officer. Griffin claimed that he *577 agreed with petitioner, but needed some time to resolve the situation with the police. Petitioner left Griffin in Central Park and went home. After petitioner left Griffin in the park, Griffin telephoned petitioner at her New York City apartment. Griffin was afraid to go to petitioner's apartment, and as a consequence he requested that petitioner meet him at different locations in New York City. For several days petitioner met Griffin at various hotels. Petitioner again tried to persuade Griffin to return to Chicago. Although she believed that Griffin was innocent of the charges made by the woman in Chicago, petitioner nevertheless maintained communications with the police. At the time the police confiscated items from the Chicago apartment, the Bentley and the Mercedes were missing. Griffin told petitioner that the cars were in storage. Apparently, Griffin informed petitioner that a woman named Tish Binion was "storing" the cars. The police began to look for the cars. Petitioner suggested that the police consult Ms. Binion to see if she was in possession of the cars or knew where they were. The police went with a warrant to Ms. Binion's mother's home, but the vehicles *578 were not there. Within 2 days, the vehicles suddenly appeared at Exotic Motors in Chicago. Exotic Motors ultimately auctioned off the Bentley and the Mercedes on petitioner's behalf. Although the police were unable to persuade petitioner that Griffin was not to be trusted, the police did convince petitioner to remove Griffin's name from a joint New York City bank account that she shared with Griffin. Griffin had deposited $ 22,500 into the account on September 22, 1989, which Griffin could not withdraw once his name was removed from the account. Petitioner's Continued Support of Griffin
Despite petitioner's attempt to prevent Griffin from gaining access to the money in the bank account, Griffin convinced petitioner to give him the $ 22,500 because he claimed that his family was in danger if he did not pay certain debts. Griffin told petitioner that the creditors had already been beating his younger brother. Petitioner spoke with Griffin's younger brother, who cried on the phone and verified that the beating had occurred. In addition to giving Griffin the $ 22,500, petitioner wrote a $ 16,000 check to herself and gave the money to Griffin on September 25, 1989. During *579 early October 1989, Griffin finally agreed to return to Chicago and hire an attorney to represent himself. Petitioner planned to go to Chicago with Griffin. Petitioner, however, had to attend an important business meeting in Europe. Petitioner was in Europe for approximately 1 week, and Griffin called her every day. Griffin assured petitioner that he was in the process of hiring an attorney and surrendering himself to his parole officer and that the entire situation would soon be resolved. Petitioner's Discovery of Griffin's Criminal History
When petitioner returned from Europe, petitioner was emotionally distraught about the situation with Griffin and felt especially vulnerable and weak as a result of her pregnancy. Petitioner was having trouble paying all of the bills. Petitioner started to lose weight and became concerned that she was going to lose her baby if she did not start taking care of herself. Because petitioner was terribly distraught, Griffin began to write some of the checks for bills in order to ease petitioner's burden. [8] Griffin also claimed he was going to wire petitioner $ 100,000 from one of his Swiss accounts to help pay the bills. *580 Meanwhile, petitioner turned to her friends, Diana Hartman and Sharon Weissman, for advice. As a result of speaking to her friends, she began to realize that she should not trust Griffin. Petitioner also felt that she would never be free of Griffin if she gave birth to his child. Petitioner decided that she wanted to have an abortion, and her two friends made the arrangements. On October 13, 1989, petitioner underwent an abortion. After the abortion, Ms. Hartman introduced petitioner to Solomon Liss, who was Ms. Hartman's attorney. After hearing petitioner's story, Mr. Liss immediately called the police in Chicago to learn more about Griffin. Petitioner and Mr. Liss then went to the U.S. Marshal's Office in New York City and met with two U.S. Marshals, Tim Hogan and Bryant Semenza. Mr. Hogan and Mr. Semenza showed petitioner pages and pages of "rap sheets" on Griffin. Mr. Liss advised petitioner not to tell Griffin that she had aborted her pregnancy. Petitioner, however, felt traumatized by the abortion and was unable to keep the news from Griffin the next time he telephoned. Griffin immediately stopped the purported $ 100,000 transfer from one of his Swiss accounts. *581 Petitioner's Attempts to Help in the Arrest of Griffin
After seeing the rap sheets on Griffin, petitioner offered to help apprehend him. Petitioner had several meetings with Mr. Hogan and Mr. Semenza during which they coached petitioner about how to handle her future communications with Griffin. Petitioner allowed her telephone to be tapped and agreed to be wired if Griffin arranged to meet with her in person. Griffin continued to call petitioner in New York City, but sensed that petitioner was suspicious of him based on the fact that she underwent the abortion. Despite petitioner and the police's efforts, Griffin was not brought into custody and remains a fugitive. Petitioner also hired a Chicago attorney, Jerry Rotenberg, to assist her in her dealings with the police in Chicago. Petitioner and Mr. Rotenberg met with the police regarding the confiscation of items from the Chicago apartment. Specifically, petitioner and Mr. Rotenberg met with Detective Edison and several other members of the fraud unit. Detective Edison showed petitioner and Mr. Rotenberg the boxes and suitcases full of items that had been taken out of the Chicago apartment by the police on September *582 22, 1989. Mr. Rotenberg then went to the Chicago apartment and discovered that the apartment was completely empty except for a safe that was in the closet. Criminal Charges Against Griffin and Petitioner's Last Communications With Griffin
Petitioner filed criminal charges against Griffin with the police. On July 2, 1990, Griffin was indicted by a grand jury of the Circuit Court of Cook County, Illinois, for the crime of theft against petitioner. Petitioner last spoke to Griffin when he telephoned her during July 1990. Griffin claimed he was calling from outside the United States. Griffin did not ask petitioner for money, and petitioner does not know Griffin's purpose in calling her. Travel and Lodging Expenses
Petitioner incurred travel and lodging expenses during taxable year 1989 in the amount of $ 8,941.81 as a result of her relationship with Griffin. The expenses included payments for airfare between New York City and Chicago, hotel rooms at the Mayfair Regent and the Omni Ambassador East in Chicago, Pontarelli Limousine Service in Chicago, taxis, and food. Medical Expenses
Petitioner incurred $ 6,692.21 in medical expenses during taxable years 1989 *583 and 1990, which she claims are related to her involvement with Griffin. The expenses included payment for medical services connected with her pregnancy, her abortion, and stress-related illnesses. Petitioner was compensated by medical insurance in the amount of $ 1,512.30. Expenses for Legal and Accounting Services
Petitioner incurred expenses for legal and accounting services in the amount of $ 30,557.49. Petitioner paid legal fees for services performed by Mr. Liss with regard to petitioner's involvement with Griffin in the amount of $ 17,750. [9] *584 Mr. Liss negotiated settlements of claims with creditors and provided legal advice with respect to the attempted apprehension of Griffin. Petitioner also paid legal fees for services performed by Mr. Rotenberg in the amount of $ 4,257.49. Mr. Rotenberg handled all legal matters in Chicago including the return of merchandise to the appropriate stores so that petitioner's accounts could be credited. Petitioner also paid accounting fees for services performed by Norman Pearlman in the amount of $ 8,550. [10] Mr. Pearlman advised her on how to manage her finances as a result of her involvement with Griffin. Petitioner's Income Tax Returns
On her Federal income tax return for taxable year 1989, petitioner claimed a theft loss deduction in the amount of $ 246,999. Petitioner's Form 4686 stated the following: "Taxpayer was a victim of fraud, theft and criminal misrepresentation which is being investigated by the financial investigation unit of the police department of the city of Chicago. Purchases took place between April 1989 and October 1989." On her tax return, petitioner calculated her theft loss by adding together the cost or adjusted basis of each of the "stolen" properties and arrived at a total of $ 662,434. [11] Petitioner then used the $ 662,434 figure as the fair market value of all of the property before the theft. Petitioner further reported that the fair market value of each of the items except for the Bentley and the Mercedes was zero after the theft. Apparently based on the amounts she received as a result of the auctioning of the vehicles *585 by Exotic Motors, petitioner claimed that the Bentley was worth $ 83,000, and the Mercedes was worth $ 58,000 after the theft. Petitioner then subtracted the fair market value of all of the items after the theft, or $ 141,000 (zero plus $ 83,000 plus $ 58,000) from the fair market value before the theft, or $ 662,434, and arrived at $ 521,434. From that amount, petitioner subtracted $ 260,149, the amount she received in insurance and other reimbursements. The resulting amount was $ 261,185. From that amount, petitioner deducted $ 100. Finally, petitioner subtracted 10 percent of her adjusted gross *586 income, or $ 14,186, from $ 261,185 and arrived at the amount of her theft loss deduction, $ 246,999. The return ultimately reported that petitioner was entitled to a tax refund in the amount of $ 34,773. [12]
Respondent determined that petitioner did not establish that a casualty or a theft occurred or that any loss was sustained and denied the $ 246,999 theft loss claimed by petitioner. In the notice of deficiency, respondent also determined that, should petitioner establish that she was the victim of a casualty, the only deductible items would be stolen cash (if verified) and attorney's expenses related to the recovery of the property. Respondent also adjusted the net operating loss generated by the claimed theft loss, which created deficiencies for petitioner's taxable years 1986 and 1987. OPINION Evidentiary Issues
Before deciding whether petitioner is *587 entitled to a theft loss deduction, we must address several evidentiary issues. At trial, petitioner offered evidence of Griffin's indictment for theft of petitioner's property as well as evidence of prior criminal acts by Griffin. Respondent objects to the introduction of such evidence on grounds of relevancy. Rule 402 of the Federal Rules of Evidence[13] provides that "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible." Rule 401 of the Federal Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *588 Respondent contends that the certified copy of Griffin's indictment for committing the crime of theft of petitioner's property is irrelevant to the instant case because it is inconsistent with petitioner's testimony at trial. Specifically, the indictment states, in pertinent part, that "Griffin committed the offense of theft * * * obtained merchandise through the fraudulent use of Patricia A. Ginesky's credit cards with intent to commit theft and failed to pay victim for said purchases". Respondent contrasts the language of the indictment with petitioner's testimony that she purchased items for Griffin on her own credit cards. Respondent contends that petitioner's testimony establishes that any property Griffin obtained from petitioner was not obtained fraudulently, thus making the indictment irrelevant. We do not agree with respondent. In deciding whether petitioner is entitled to her claimed theft loss, the threshold inquiry is whether a theft occurred. Consequently, we must analyze whether Griffin's alleged wrongful act or acts amount to a theft under local law. Edwards v. Bromberg, 232 F.2d 107, 111 (5th Cir. 1956). Respondent's contention *589 that the indictment is inconsistent with petitioner's testimony, if correct, goes merely to the weight to be afforded to the indictment, not to its admissibility. United States v. Quiroz, 13 F.3d 505, 514 (2d Cir. 1993); First Natl. Bank v. United States, 763 F.2d 891, 894-895 (7th Cir. 1985); Estate of Gilford v. Commissioner, 88 T.C. 38, 54 n.18 (1987). Moreover, as to respondent's contention that petitioner's testimony is inconsistent with the indictment, petitioner testified that she used the credit cards to purchase property for and make cash advances to Griffin. The indictment's charge that Griffin "obtained merchandise through the fraudulent use of" petitioner's credit cards is not materially different, as the latter phraseology would appear to include the former. In short, the certified copy of Griffin's indictment aids us in deciding whether a theft occurred under Illinois law. Consequently, we hold that such evidence is relevant, and, therefore, admissible in the instant case. [14]Fed. R. Evid. 401 and 402. *590 Petitioner also seeks to introduce the following evidence of other criminal acts committed by Griffin: (1) The criminal indictments of Griffin for the fraudulent use of credit cards belonging to women other than petitioner; [15] *591 (2) Griffin's guilty plea to the crime of illegal possession of a firearm more than 10 years ago; (3) Griffin's guilty plea to one count of an indictment charging him with mail fraud; (4) Griffin's prior conviction for theft and conspiracy with Dorothy Collins in stealing a watch; and (5) the testimony of Joan Pierotti establishing Griffin's prior criminal behavior. Petitioner contends that evidence of Griffin's prior criminal behavior is sufficiently similar to the circumstances of the alleged crime, making the evidence relevant to show Griffin's intent to defraud petitioner. [16] Respondent objects to the introduction of all of such evidence, claiming that it is not relevant because petitioner has not established that the other criminal acts were sufficiently similar to the alleged crime in the instant case. As to the evidence regarding Griffin's illegal possession of a firearm, we agree with respondent that it is not relevant to the instant case within the meaning of rule 401 of the Federal Rules of Evidence. Griffin's possession of a firearm more than 10 years ago does not have the tendency to prove or disprove the alleged theft of petitioner's property. We, however, are convinced that the remaining evidence *592 of other criminal acts of Griffin offered by petitioner is relevant to the establishment of Griffin's intent, motive, common scheme, or plan; i.e., his modus operandi. Respondent's argument that Griffin's prior acts are not sufficiently similar to the facts of the instant case goes to the weight of the evidence and not its admissibility. United States v. Quiroz, supra; First Natl. Bank v. United States, supra at 894-895; Estate of Gilford v. Commissioner, supra at 54 n.18. Consequently, we hold that such evidence is admissible. The Occurrence of a Theft
We now turn to the issue of whether petitioner is entitled to a theft loss deduction as a result of Griffin's acts. In order to resolve the issue, we first must decide whether a theft occurred. Petitioner contends that the circumstances by which she was defrauded by Griffin constitute a theft. Respondent, on the other hand, contends that no theft occurred and that petitioner gave Griffin cash and property as gifts during the normal course of a "romantic relationship". Section 165(a) allows a deduction for any loss *593 sustained during the taxable year which is not compensated for by insurance or by other means. Section 165(c)(3), however, limits losses by individuals that are not connected with a trade or business or a transaction entered into for profit to losses arising from casualty or theft. Although the term "theft" is not defined in the Code, the regulations provide that "the term 'theft' shall be deemed to include, but shall not necessarily be limited to, larceny, embezzlement, and robbery." Section 1.165-8(d), Income Tax Regs.
Consequently, as used in section 165(c)(3), theft is intended to incorporate any criminal taking of another's property, including the crime of false pretenses. Edwards v. Bromberg, 232 F.2d 107, 110 (5th Cir. 1956); Gerstell v. Commissioner, 46 T.C. 161 (1966). The factual existence of the theft must be established by reference to the law of the jurisdiction where the loss occurred. Weingarten v. Commissioner, 38 T.C. 75, 78 (1962); Monteleone v. Commissioner, 34 T.C. 688, 692 (1960). Although a criminal conviction in a State court may *594 conclusively establish the existence of a theft, the deduction does not depend upon whether the perpetrator is convicted or prosecuted or even whether the taxpayer chooses to move against the perpetrator. Weingarten v. Commissioner, supra at 78; Vietzke v. Commissioner, 37 T.C. 504, 510 (1961). Moreover, the taxpayer must prove only by a preponderance of the evidence that a theft occurred under the relevant State statute. Rule 142(a); Jones v. Commissioner, 24 T.C. 525, 527 (1955); Allen v. Commissioner, 16 T.C. 163, 166 (1951); Hartley v. Commissioner, T.C. Memo. 1977-317. In Illinois, the crime of theft by false pretenses is encompassed in Ill. Ann. Stat. ch. 38, sec. 16-1 (Smith-Hurd 1991), which provides, in pertinent part, that a "person commits theft when he knowingly * * * obtains by deception control over property [17] of the owner". In Skolnick v. Commissioner, 55 T.C. 1055, 1062 (1971), we specifically interpreted Illinois' theft by false pretenses statute in addressing whether a *595 taxpayer was entitled to a theft loss deduction. In Skolnick v. Commissioner, supra at 1062, we stated: An essential element of the offense of false pretenses in Illinois is that the accused obtain money with the intent to defraud. People v. Scowley, 353 Ill. 330, 187 N.E. 415 (1933). However, the specific intent to defraud need not be proved by direct evidence, but may be proved by facts and circumstances. People v. Blume, 345 Ill. 524, 178 N.E. 48 (1931). Moreover, any misrepresentation of a past fact, knowingly and designedly made to induce another to part with his property, is a false pretense under Illinois law. People v. Martin, 372 Ill. 484, 24 N.E. 2d 380 (1939); People v. Gruber, 362 Ill. 278, 200 N.E. 483 (1935); People v. Schneider, 327 Ill. 270, 158 N.E. 448 (1927); Keyes v. People, 197 Ill. 638, 64 N.E. 730 (1902).
*596 Petitioner contends that Griffin obtained petitioner's money and property with the clear intent to defraud petitioner. Petitioner testified that Griffin misrepresented himself in order to charm petitioner and induce her to part with her money. Griffin lied about the fact that he was incarcerated, about why he was incarcerated, and about his being a successful real estate entrepreneur. He was cunning and adept at deceiving women into parting with their money and property. He was ultimately indicted by a grand jury of the Superior Court of Cook County, Illinois, for the crime of theft against petitioner in the amount of $ 662,364 under Ill. Ann. Stat. ch. 38, sec. 16-1 (Smith-Hurd 1991). Petitioner presented other compelling evidence of Griffin's intent to defraud women on repeated occasions. Specifically, Joan Pierotti, of Washington, D.C., testified at length about her experiences with Griffin. During or about 1983, Ms. Pierotti similarly placed an ad in the personals section of Washingtonian Magazine in order to meet single men. Griffin responded to Ms. Pierotti's ad indicating that he was a stock trader for the Chicago Board of Trade and that he was moving to the Washington, *597 D.C., area and wanted to meet her. Ms. Pierotti attempted to contact Griffin in Chicago, but he did not respond to her messages. Weeks later, Griffin began telephoning Ms. Pierotti regularly. During one phone call, Griffin told Ms. Pierotti that he was incarcerated in Petersburg, Virginia, for tax evasion. Griffin successfully convinced Ms. Pierotti that he had been victimized by the tax system and his lawyer and ultimately persuaded her to visit him in prison. Ms. Pierotti began visiting the prison on a regular basis because she felt sympathetic towards his situation. Griffin then persuaded Ms. Pierotti to provide him with money for legal assistance. Initially, Ms. Pierotti provided Griffin with $ 400 to obtain legal documents from Cook County, Illinois, and then another $ 2,000 to file an appeal in Chicago. Soon after that, Ms. Pierotti wired approximately $ 10,000 to the prison in Petersburg for Griffin to use to pay the legal fees of a lawyer in Washington, D.C. Later, Ms. Pierotti mortgaged her home in order to provide Griffin with $ 36,000 which he claimed was to be used for more legal services. After Ms. Pierotti provided Griffin with the $ 36,000, she was under the *598 impression that he was going to be released from prison. When Griffin was not released, she became suspicious and tried to stop the transfer of the $ 36,000. Ms. Pierotti learned that the money had already been moved to another bank. At that point, Ms. Pierotti contacted her own lawyer as well as the Federal Bureau of Investigation and discovered that Griffin was under investigation because he had defrauded approximately 12 women in one way or another. Indeed, the record establishes that Griffin was indicted by grand juries in the Superior Court of Cook County for theft by false pretenses against three women other than petitioner. Ms. Pierotti brought charges against Griffin, and he was indicted on 30 counts. Griffin entered into a plea bargain under which he pled guilty to six or seven of the counts and was sentenced to 5 years in Federal prison. Ms. Pierotti ultimately recovered $ 5,000, which Griffin had obtained from another woman, but, as of trial, she was still $ 57,000 out of pocket. Respondent, on the other hand, contends that the instant case is similar to Hallam v. Commissioner, T.C. Memo. 1983-384, in which we decided that a taxpayer *599 was not entitled to a theft loss deduction for funds that were allegedly misappropriated by a man with whom the taxpayer was romantically involved. In Hallam, the taxpayer, a highly educated woman, became romantically involved with William Gross. During the course of their relationship, the taxpayer allowed Gross unrestricted use of her car as well as one of her residences, guaranteed the payment of Gross' American Express card, devised her entire estate to him, and provided him with $ 8,579.57 over 3 years. The taxpayer later brought criminal charges in Maryland against Gross claiming that Gross misappropriated her property. The criminal charges were eventually dropped. The taxpayer also brought a civil suit against Gross. The taxpayer ultimately claimed a theft loss deduction on her Federal income tax return arising out of Gross' alleged misappropriation of her property. In Hallam, we found the taxpayer's testimony regarding the circumstances under which she transferred money to Gross to be vague and unspecific. We ultimately held that the taxpayer did not meet her burden of proof because she did not establish that the crime of theft had been committed under Maryland *600 law. We think that the instant case is factually distinguishable from the situation in Hallam. In the instant case, petitioner presented clear and specific testimony as to the circumstances under which Griffin obtained money and other property from her. Petitioner's story is corroborated by Griffin's indictment for theft in Illinois, as well as by Ms. Pierotti's testimony regarding Griffin's ability to deceived. Respondent seems to imply that no theft occurred because petitioner decided to become involved with Griffin notwithstanding the fact that he was incarcerated in a Federal prison. Essentially, respondent argues that petitioner "should have known better" than to become involved with an inmate. Respondent's argument may have some appeal, but we do not pass judgment on the propriety of petitioner's decision to become involved with Griffin. Naivete or gullibility, however offensive or distasteful to respondent, is not a bar to a theft loss deduction. In Nichols v. Commissioner, 43 T.C. 842, 886 (1965), we stated: In allowing a deduction for "theft" losses Congress did not distinguish between losses sustained by the naive or greedy from *601 those suffered by others. Indeed gullibility or cupidity of the victim is often the crucial factor that enables the swindler to succeed in his fraud. * * *
See also United States v. Price (In re Hoyt), 73 AFTR 2d 1618, 94-1 USTC par. 50,160 (N.D. Okla. 1994) (debtor had deductible theft loss when former boyfriend manipulated her into giving him $ 2 million). Based upon the record in the instant case, we hold that petitioner has established that she was a victim of theft of her property under the laws of Illinois. Consequently, our remaining inquiry is into the amount that petitioner is entitled to deduct under section 165(c). The Amount of the Deduction
On brief, petitioner claims that she is entitled to a theft loss deduction in the amount of $ 280,145.43 [18] *603 for taxable year 1989. Petitioner contends that the $ 280,145.43 loss is based on the following: (1) $ 223,884.75 of cash payments made by petitioner to credit card companies for cash advances she obtained for Griffin on her credit cards and for credit card purchases for Griffin; [19] (2) $ 12,000 for an Erte sculpture that was allegedly stolen by Griffin from *602 their Chicago apartment; (3) $ 8,941 for personal travel and lodging expenses in connection with trips made to Danbury, Connecticut, and Chicago, Illinois, to visit Griffin; [20] (4) $ 4,762.19 for medical expenses which petitioner incurred as a result of Griffin's alleged theft; [21] and (5) $ 30,557.49 in legal and accounting fees for the services of a Chicago attorney to handle proceedings involving Griffin in Chicago, for a New York attorney to negotiate settlements with creditors, and an accountant to analyze and compute the tax consequences of her loss. Respondent contends that, except for cash and attorney's fees, none of petitioner's various expenditures are deductible under section 165(c)(3). Except as to the issue of deductibility of attorney's fees, which is discussed below, the parties have not cited any cases in which a taxpayer *604 has sought to deduct the variety of expenses that petitioner claims she is entitled to deduct pursuant to section 165(c)(3). The language of section 165(c) specifically states that in order to be deductible, losses of property must "arise from * * * theft." The regulations similarly provide that "any loss arising from theft is allowable". Sec. 1.165-8(a)(1), Income Tax Regs.
Accordingly, the test for deductibility focuses on the theft of the taxpayer's property and whether the taxpayer's loss is sufficiently associated with the property stolen, the recovery of the property, or the diminution of the loss of property; i.e., expenses occasioned by attempts to limit the taxpayer's loss. See Ander v. Commissioner, 47 T.C. 592 (1967). Having the proper focus in mind, we separately address each of petitioner's claimed deductions. 1. The Cash Payments to or for Griffin
Petitioner contends that she is entitled to a deduction for the cash payments to credit card companies for credit card purchases and advances made to or for Griffin. Petitioner testified that Griffin's misrepresentations caused her to provide him with thousands of dollars in cash advances *605 and to pay credit card bills for his clothing, health club expenses, dining, and several limousine services, as well as other expenses. [22] At trial, petitioner identified numerous copies of credit card statements (which included the cash advances) and testified that all of the payments made toward cash advances and credit card purchases reflected cash given to Mr. Griffin or payments made for his benefit. Petitioner further testified that charges to the Ritz Carlton and the Omni Ambassador were probably for meals at these hotels. Petitioner concedes that she shared such meals with Griffin. Petitioner submitted credit card statements to substantiate her testimony at trial. After reviewing the credit card statements, it is clear that some of the payments toward credit card purchases or cash advances were made solely *606 for Griffin's benefit. Many of the credit card statements, however, merely acknowledge petitioner's partial payment of an outstanding balance. In short, the submitted credit card statements do not indicate the purpose of many of petitioner's payments, and the record does not reveal such purpose. Additionally, in instances where the documentary evidence establishes the purpose or purposes of petitioner's payments, we are unable to conclude that all of the expenditures were solely for Griffin's benefit. For example, two credit card statements from Neiman Marcus indicate the purchase of service plates as well as items made by Christofle. [23] Petitioner testified that she purchased china for the couple to use in the Chicago apartment. Although we concluded that petitioner was indeed a victim of theft, petitioner also has the burden of proving the amount of property that is the subject of the theft. Funds that were expended for her *607 personal benefit are nondeductible personal expenditures under section 262(a). The record in the instant case is unclear, however, as to the amount of her expenditures from which petitioner personally benefited. Nonetheless, the record does establish that petitioner is entitled to some deduction for her theft loss, which brings into play the rule of Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). In applying Cohan, we must bear heavily against petitioner, whose inexactitude was of her own making. Consequently, we hold that petitioner is entitled to deduct only 50 percent of the payments she contends were made to or for Griffin. We think that such percentage properly reflects petitioner's failure to establish that Griffin was the only one to benefit from petitioner's expenditures and is based on the premise that petitioner shared in such expenditures equally with Griffin. Although petitioner submitted credit card statements and bills documenting $ 190,643.21 [24] in expenditures, except for the statue discussed below, we hold that only one-half of such figure, $ 95,321.60, is the amount of petitioner's deduction for money and other property *608 stolen from petitioner by Griffin. *609 2. The Erte Statue
Petitioner next contends that she is entitled to a $ 12,000 deduction for the theft of the Erte statue, which was missing from the Chicago apartment. [25] Petitioner testified that she gave Griffin the Erte statue and that the statue had been kept in the Chicago apartment. Petitioner further testified that she was unable to find it among the items confiscated by the police. Consequently, we hold that the statue was stolen from petitioner and that she is entitled to a theft loss deduction for the stolen statue. We must next decide the amount petitioner is entitled *610 to deduct with respect to the Erte statue. The amount allowable as a theft loss is the lesser of the fair market value of the stolen property at the time of the loss or the taxpayer's adjusted basis in the property at that time. Wilson v. Commissioner, T.C. Memo. 1982-107; secs. 1.165-8(c), 1.165-7(b)(1), Income Tax Regs. Petitioner testified that she paid approximately $ 5,000 to $ 5,500 for the statue and that Dyansen Galleries, where she purchased it, estimated its value was $ 12,000 when she gave it to Griffin. Accordingly, we hold that petitioner is entitled to a deduction in the amount of $ 5,000, her basis in the statue. 3. Travel and Lodging Expenses
Petitioner next contends that she is entitled to deduct personal travel and lodging expenses which she incurred during the course of her relationship with Griffin. Petitioner contends that such expenses are deductible because petitioner would not have incurred such expenses had Griffin not misrepresented himself to her. Respondent contends that such expenses are nondeductible incidental personal expenses. Although it may be true that petitioner would not have incurred the expenses but *611 for Griffin's deceptions, the fact that the expense was incurred because of the perpetrator's actions is not the sole test of deductibility. As we stated above, the test focuses on whether the taxpayer's loss is sufficiently associated with the property stolen, the recovery of the property, or the diminution of the loss. Ander v. Commissioner, 47 T.C. 592 (1967). The majority of petitioner's travel and lodging expenses, except for the one expense discussed below, were not incurred directly in the scheme leading to Griffin's theft of petitioner's money and property. Moreover, such expenses were not incurred in recovering the property or attempting to minimize the loss. Consequently, we hold that such expenses were incidental personal expenses which are nondeductible under section 262(a). Petitioner, however, testified that she traveled to Chicago in November to meet with the police and her Chicago attorney in an attempt to recover all or some of her property. We hold that petitioner is entitled to deduct the $ 613 she paid for airfare as it was incurred in an attempt to minimize her loss. We, however, sustain respondent's disallowance of petitioner's *612 other travel and lodging expenses. 4. Medical Expenses
Petitioner contends that she is entitled to deduct the medical expenses, which she argues she would not have incurred but for Griffin's fraudulent actions. Petitioner submitted documentary evidence establishing that she incurred medical expenses for the following: (1) Her pregnancy; (2) termination of her pregnancy; (3) a mammogram; (4) a pap smear; (5) treatment for hair loss; (6) treatment for gum disease; (7) treatment for skin rashes and acne; (8) treatment for back and neck pain; (9) an eye examination; (10) psychotherapy; and (11) vitamins. Some of the expenses were incurred during taxable year 1989, but many of the expenses were incurred during taxable year 1990. In reviewing petitioner's expenses, we conclude that the medical expenses do not arise out of the theft of petitioner's property. Although petitioner's medical ailments are the unfortunate consequences of being the victim of a crime, and may in fact have been the result of criminal acts against her person, they did not arise from a theft of her property. Congress has singled out for deduction only losses arising out of theft of a taxpayer's property *613 and, as the courts have interpreted, associated expenses of recovery of the property or minimizing the loss. The statute does not expressly allow deduction for losses associated with other criminal actions against the person, such as battery, rape, etc. For example, as we interpret section 165(c)(3), if a robbery victim were hospitalized due to the perpetrator's use of force against the person, the victim would only be entitled to a deduction for any stolen property but not for any of the medical expenses arising out of the victim's battery. Although petitioner's medical expenses may have arisen out of Griffin's scheme to deceive petitioner out of her property, we simply cannot extend the statute to cover such medical expenses. That is the province of the legislature. See Otmishi v. Commissioner, T.C. Memo. 1980-472 (citing Peyton v. Commissioner, 10 B.T.A. 1129, 1130-1131 (1928)). Accordingly, we sustain respondent's disallowance for the deduction of petitioner's medical expenses as a theft loss. [26]
*614 Lastly, we note that, even if petitioner's medical expenses were deductible under section 165(c), petitioner would not be entitled to deduct expenses incurred during 1990 on her 1989 tax return. As she incurred such expenses during taxable year 1990, under the cash method of accounting, she is entitled only to deductions for the taxable year during which the expenses were paid. Sec. 1.461-1(a)(1), Income Tax Regs.
5. Attorney's and Accounting Fees
Petitioner lastly contends that she is entitled to deduct the fees she paid for legal and accounting services that she incurred as a result of the theft. [27] In Ander v. Commissioner, 47 T.C. 592 (1967), we specifically confronted the issue of whether a taxpayer may deduct, as part of the theft loss, attorney's fees associated with the theft. In Ander, the taxpayer's husband, unbeknownst to the taxpayer, had cashed a check that he and the taxpayer had received from the sale of a residence which was held jointly. Subsequently, the husband utilized all of the proceeds. The taxpayer sued her husband for conversion and fraud. As a result of the lawsuit, the taxpayer recovered her portion of the *615 proceeds, but had expended more than $ 6,000 in attorney's fees in doing so. The taxpayer claimed that she was entitled to deduct the amount of the attorney's fees as a theft loss. We decided that the expenses were deductible, basing our holding on two analogies to the casualty loss situation. The first analogy was to section 1.165-7(a)(2)(ii), Income Tax Regs., which permits a taxpayer to deduct the cost of repairs to damaged property where such cost represents the loss in the value of the property. [28] The second analogy was to language in Ticket Office Equip. Co. v. Commissioner, 20 T.C. 272, 280 n.6 (1953), affd. 213 F.2d 318 (2d Cir. 1954), in which we stated that "It would be anomalous in the extreme if expenses paid to reduce the amount of such an ordinary loss [casualty] were not themselves deductible in full, as partaking of the nature of the loss to which they relate." See Arrowsmith v. Commissioner, 344 U.S. 6 (1952). In Ticket Office, we ultimately held that the taxpayer was entitled to take deductions for attorney's fees and an insurance adjustor's fees. But see Tarsey v. Commissioner, 56 T.C. 553 (1971). *616 Petitioner testified in the instant case that she hired attorneys and an accountant to minimize her theft loss. Although petitioner was unable to fully recover her property, we are convinced that petitioner's attorney's and accounting fees, except as to $ 6,500 in legal and accounting fees dealing with consultation regarding petitioner's taxes for taxable year 1989, which are deductible *617 only under section 212(3) as itemized miscellaneous deductions subject to the 2-percent floor, are closely identified and connected with her theft loss and were incurred in an attempt to minimize her loss. Consequently, we hold that petitioner is entitled to deduct the $ 24,057.49 of legal and accounting expenses as a theft loss. Accordingly, we hold petitioner's allowable theft loss deduction for taxable year 1989 is $ 119,992.09 ($ 95,321.60 plus $ 613 plus $ 24,057.49). [29]
To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. The visiting room did not have partitions to separate visitors from the inmates. Inmates and visitors were permitted to sit with each other at the tables and chairs in the visiting room.↩
2. Petitioner asserted in her petition that Griffin was actually sentenced to serve a 5-year term at the Danbury prison as a result of being convicted of mail fraud in connection with obtaining money from a woman by false pretenses. Respondent apparently does not dispute that Griffin was incarcerated at the Danbury prison on account of his conviction for mail fraud, as respondent's counsel stated such fact during the opening statement.↩
3. Griffin had become an inmate at the Danbury prison on Nov. 26, 1987.↩
4. Griffin had added his name to at least one of petitioner's accounts such that his name was on the card, but petitioner was liable for payment.↩
5. At the time, petitioner owned a Datsun which she purchased prior to her involvement with Griffin. Petitioner used the Datsun in New York City.↩
6. Petitioner never drove either of the cars. Griffin always drove when petitioner was visiting him.↩
7. The woman accompanied the police to the Chicago apartment, knocked on the door, and led Griffin to believe that she was alone. Because Griffin thought that the woman was alone, he opened the door. He allowed the police to search the apartment because they had a search warrant. The police, however, did not have a warrant for Griffin's arrest.↩
8. It appears, however, that the money used was from petitioner's bank accounts.↩
9. Of the $ 17,750, $ 3,500 was for Mr. Liss' review of respondent's answer to petitioner's Tax Court petition, dealings with District Counsel, review of filed documents, compilation of documents for respondent's review, and preparation of summaries for District Counsel.↩
10. Of the $ 8,550, $ 3,000 was specifically for Mr. Pearlman's services regarding the audit of petitioner's tax return for taxable year 1989.↩
11. Petitioner reported the cost or adjusted basis of each item as follows: ↩
Description of Property
Cost or Adjusted Basis
Art work
$ 30,300 Jewelry
76,695
Dinnerware, crystal, china
10,893
Clothing and sundries
36,762
Disbursements effected through
48,279
fraud and misrepresentation  Furniture
18,567
Household goods and appliances
11,016
Cash
220,922
Bentley - Auto
120,000
Mercedes
89,000
662,434
12. Petitioner gave her refund check to Mr. Liss, who placed the money in a separate bank account to be used for paying off petitioner's creditors.↩
13. Pursuant to sec. 7453 and Rule 143, trials before the Tax Court are to be conducted in accordance with the rules of evidence applicable in trials without a jury in the U.S. District Court for the District of Columbia.↩
14. Respondent does not object to the admissibility of such evidence on any other ground.↩
15. The Circuit Court of Cook County, Illinois, issued these three indictments on the same date, July 2, 1990, as it issued the indictment of Griffin for the theft of petitioner's property.↩
16. Petitioner specifically contends that Fed. R. Evid. 404(b) allows for the admission of the aforementioned items. Fed. R. Evid. 404(b), in pertinent part, provides as follows: Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
As we stated at trial, we need not reach petitioner's argument regarding rule 404(b)↩ because respondent's only objection is based on relevancy and not on the improper use of character evidence.
17. Ill. Ann. Stat. ch. 38, sec. 15-1 (Smith-Hurd 1991) provides that property includes money.↩
18. We note that such amount is different than the deduction claimed on petitioner's 1989 tax return where she reported that the cost or adjusted basis of all properties "stolen" was $ 662,434 and after completing the calculations on Form 4686, she claimed a $ 246,999 deduction. Petitioner reasserted in her petition that she is entitled to a theft loss deduction as reported on her 1989 tax return. We further note that the $ 280,145.43 figure is different from the $ 328,302 in stipulated expenses petitioner had during 1989. The parties have failed to account for any of the discrepancies, and petitioner has not sought to amend her petition.↩
19. In reviewing the credit card statements submitted by petitioner, we calculate the total of petitioner's submitted expenditures to be $ 190,643.21. According to petitioner, the cash expenditures represent petitioner's actual cash outlay to or on behalf of Griffin. Petitioner did not claim a theft loss deduction on her 1989 income tax return for credit card debt that was incurred, but not paid. Petitioner testified that, as of trial, she still owed approximately $ 80,000 to various creditors. Petitioner does not claim that she is entitled to a deduction for the outstanding debt.↩
20. We calculate the total of petitioner's submitted travel and lodging expenses to be $ 8,941.81.↩
21. We calculate the total of petitioner's submitted medical expenses to be $ 6,692.21. After subtracting $ 1,512.30, the amount petitioner received from various insurance companies, we calculate petitioner's claimed deduction for medical expenses to be $ 5,179.91.↩
22. Among the credit card expenses were payments made to New York Magazine and Chicago Magazine for Griffin. Apparently, unbeknownst to petitioner, Griffin had placed personal ads in both magazines.↩
23. Items sold under the brand name of Christofle include fine china and flatware.↩
24. Although petitioner claimed on her 1989 tax return that she was entitled to a $ 37,000 deduction for the Bentley and a $ 31,000 deduction for the Mercedes (before applying any limitations), we note that petitioner has failed to establish that she made payments with respect to the automobiles in excess of $ 15,534.95. Consequently, only $ 15,534.95 in payments toward the luxury automobiles is included in the $ 190,643.21 figure. Additionally, petitioner claimed she was entitled to deduct the $ 22,500 she gave to Griffin when he convinced her to provide him with such amount in order to purportedly pay off his creditors. Petitioner has not established that the $ 22,500 belonged to her. Petitioner testified that Griffin deposited $ 22,500 in one of their joint New York accounts after he realized the police were suspicious of him. Petitioner also testified that Griffin had access to several of his own bank accounts in addition to her bank accounts. Accordingly, because petitioner has failed to establish that the $ 22,500 was from her own funds, we hold that petitioner is not entitled to deduct such amount.↩
25. Petitioner also testified that she kept a diamond wedding ring, which she received from her ex-husband, in the Chicago apartment and that the ring was missing from the Chicago apartment. Petitioner, however, did not describe the ring or its value. Additionally, petitioner did not offer admissible evidence which would allow us to estimate her adjusted basis in the ring or the fair market value of the ring before the theft.↩
26. We note that medical expenses are generally deductible under sec. 213, subject to the 7.5-percent floor.↩
27. Respondent concedes in the notice of deficiency that if petitioner establishes that she was a victim of theft, she is entitled to deduct verified attorney's fees related to the recovery of any stolen property. Petitioner, however, did not separately state on her Federal income tax return for 1989 the amount of attorney's fees that she incurred in order to recover her property. Consequently, we will address the deductibility of petitioner's attorney's fees for substantiation purposes.↩
28. We note that theft loss deductions are to be calculated in the same manner as casualty loss deductions. Sec. 1.165-8(c), Income Tax Regs.↩
29. Such amount reflects petitioner's allowable deduction before the application of the $ 100 limit under sec. 165(h)(1) and the 10-percent adjusted gross income limit under sec. 165(h)(2)(A)(ii).↩